UNITED STATES of America, Plaintiff,

State of Indiana, by its agent Indiana Department of Environmental Management, Intervening Plaintiff,

v.

INDIANA WOODTREATING CORP., Defendant.

No. IP 86–253–C.

United States District Court, S.D. Indiana, Indianapolis Division.

March 18, 1988.

Sue Hendricks Bailey, Asst. U.S. Atty., Deborah E. Albright, Deputy Atty. Gen., Indianapolis, Ind., for plaintiff.

David C. Campbell and Ellen C. Siakotos, Bingham, Summers, Welsh & Apilman, Indianapolis, Ind., for defendant.

## ORDER

STECKLER, District Judge.

This matter is before the Court on the motion of plaintiff United States of America for partial summary judgment pursuant to Fed.R.Civ.P. 56. This rule states, in part, that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). In ruling on a summary judgment motion, the district court must examine the evidence in the light most favorable to the nonmoving party by drawing all reasonable inferences in favor of that party. *See Vachet v. Central Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir.1987); *United States Shoe Corp. v. Hackett*, 793 F.2d 161, 166 (7th Cir.1986). The Court, having examined the motion, the memorandums of law, the affidavits and the other exhibits, now finds that there is no genuine issue as to any material fact and the plaintiff United States of America is entitled to partial summary judgment on liability as a matter of law. The Court now enters the following findings of fact and conclusions of law.

### Findings of Fact

1. The plaintiff, the United States of America, filed this action against the defendant, Indiana Woodtreating Corporation ("IWC") on February 26, 1986. In the complaint, the plaintiff alleged that IWC had committed numerous violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6991h. On April 24, 1987, the Indiana Department of Environmental Management entered the action as an intervening plaintiff.

2. Since at least 1977, IWC has operated a woodtreating plant in Bloomington, Indiana. At the plant IWC produces railroad ties. In the production process, IWC treats wood with a creosote-coal tar solution.

3. IWC placed creosote-coal tar solution that it had spilled in the production process in a wastepile or elsewhere on its property. The wastepile at IWC's plant contains creosote soaked sawdust.

4. From 1977 to September 6, 1984, IWC's plant generated wastewater from the treatment of wood with a creosote-coal tar solution. This wastewater came into contact with creosote, and hence contained creosote. IWC produced wastewater at a rate of 240,000 gallons per year during the period from November 19, 1980, to September 1984. IWC placed the wastewater in two impoundments (evaporation ponds) at its facility.

5. The wastepile and the impoundments at IWC's plant contained bottom sediment sludge from the creosote-coal tar solution. The sludge at the bottom of the impoundments contained creosote constituents, including phenanthrene, naphthalene and acenaphthene. The concentration of the constituents ranged from 7,900 to 250,000 parts per million.

6. IWC did not file a complete "Notification of Hazardous Waste Activity" form with the Environmental Protection Agency ("EPA"). IWC did send an incomplete notification form to the EPA. In a letter at-

tached to the form, IWC's president, John Gourley stated:

> We are a small plant, who treat railroad crossties with creosote. After a thorough review of the specifications and our operations we feel we are exempt from filing under Section 261.5 of the regulations which would classify us as a small quantity generator.

On the notification form itself, IWC did not indicate whether it generated, treated, stored or disposed of hazardous waste. IWC also did not indicate the types of hazardous waste it generated or stored.

7. IWC has never removed any of the sludge that has accumulated in its impoundments. All of the sludge that settled out of the wastewater over the years is still in the impoundments. As of 1985, measurements showed that the east impoundment was 46 feet by 44 feet and held sludge one foot deep, while the west impoundment was 46 feet by 32 feet and held sludge one-half foot deep. As of 1985, approximately 145 cubic yards of creosote sludge, with an estimated weight of 128,-573.3 kilograms, had accumulated on the bottom of IWC's impoundments. On average an estimated 2,472.5 kilograms of sludge accumulated per month for the time that IWC was placing wastewater into its impoundments, June 1980 to September 1984.

8. IWC did not obtain a RCRA permit for the treatment, storage, or disposal of hazardous waste. IWC did not submit a Part A application for a permit under RCRA and did not obtain interim status under RCRA.

9. The EPA and Indiana officials conducted an RCRA interim status compliance inspection at the IWC facility on September 10 and 11, 1985. The inspection revealed the following:

a. IWC had not obtained a detailed chemical and physical analysis of a representative sample of its waste.

b. IWC had not maintained a waste analysis plan at its facility.

c. IWC had not implemented a groundwater monitoring program capable of detecting a discharge of hazardous waste into groundwater.

d. IWC had not established a closure trust fund.

e. IWC had not established a surety bond guaranteeing payment into a closure trust fund.

f. IWC had not obtained a closure letter of credit for IWC.

g. IWC had not established a financial test and corporate guarantee for closure of its facility.

h. IWC had not established financial assurance of any kind for the closure of the facility.

i. IWC had not displayed warning signs of any kind along Clear Creek or the railroad tracks which provided access to the active portion of the facility.

j. IWC had not performed inspections of its facility to detect facility malfunctions and deterioration, or operation errors or discharges of hazardous waste constituents into the environment.

k. IWC had not instituted or maintained a training program or classroom instruction to teach its employees to perform their duties in accordance with interim status regulations.

l. IWC had not maintained a contingency plan to minimize hazards to human health or the environment from fires, explosions, or any unplanned, sudden, or nonsudden release of hazardous waste or hazardous waste constituents into the air, soil or surface water.

m. IWC had not maintained operating records regarding, among other things, the location and quantity of hazardous waste within the facility, results of waste analyses, results of inspections, and details of hazardous waste received at the facility.

n. IWC had not submitted annual or biennial reports concerning its generation, and treatment, storage or disposal of hazardous waste.

o. IWC had not prepared or maintained an RCRA closure plan for the IWC facility.

p. IWC had not maintained two feet of Freeboard in its surface impoundments: the liquid level in the impoundments had been higher than two feet from the top of the impoundment.

q. IWC had not placed a protective cover of any kind over the waste pile at the facility.

r. IWC had not protected its wastepile from wind dispersal.

10. During the inspection of September 10 and 11, 1985, inspectors observed that water evidencing a sheen emptied into Clear Creek from the eastern embankment of the creek which is located on defendant's property. Inspectors also observed dark substances on the bottom of Clear Creek which, when disturbed, gave off an oily sheen. This dark, thick substance was oozing into Clear Creek from the eastern embankment.

11. During the inspection of September 10 and 11, 1985, inspectors observed that creosote was spilled on the surface soil throughout the IWC facility. Inspectors also observed numerous bodies of creosote at the bottom of Clear Creek. This creosote was oozing into Clear Creek from the eastern embankment.

12. Inspectors took borings into the soil below the wastepile at the IWC facility. Laboratory analysis of the borings showed the presence of several hazardous constituents of creosote in the soil.

13. Inspectors also took samples of the following: sludge and water from one of the impoundments; sediment and water from two "seeps" of dark substances along the eastern embankment of Clear Creek; sediment from the bottom of Clear Creek; nonaqueous liquids from Clear Creek; and soil between the impoundments and Clear Creek. Laboratory analyses of the samples showed concentrations of hazardous constituents of creosote. The soil borings between the impoundments and Clear Creek did not show contamination at the surface but did show the presence of several hazardous creosote constituents in the saturated zone (subsurface groundwater where soil pores are filled with water), 52 to 72 inches below the surface. The evidence indicates a release of hazardous waste and constituents from one or both of the impoundments at the IWC facility.

14. On February 7, 1986, the Regional Administrator of the United States EPA Region V determined that there had been a release of hazardous waste into the environment from the IWC facility.

Conclusions of Law

Based on the foregoing findings of fact, the Court now makes the following conclusions of law.

1. The Court has jurisdiction over the subject matter of this action. 28 U.S.C. §§ 1331, 1345 and 42 U.S.C. §§ 6928, 6973.

2. IWC failed to notify EPA of its hazardous waste activity under § 3010 of RCRA. Section 3010 of RCRA, 42 U.S.C. § 6930, provides that:

Not later than ninety days after promulgation of regulations ... listing any substance as hazardous waste subject to this subchapter, any person generating or transporting such substance or owning or operating a facility for treatment, storage, or disposal of such substance shall file with the Administrator ... a notification stating the location and general description of such activity and the identified or listed hazardous wastes handled by such person.

The EPA issued regulations listing hazardous wastes, pursuant to § 3001 of RCRA, 42 U.S.C. § 6921, on May 19, 1980. (45 Fed.Reg. 33,083 *et seq.*) Persons generating, or treating, storing or disposing of such hazardous wastes were required to file a notification of hazardous waste activity with the EPA by August 18, 1980.

IWC generated, and also treated, stored or disposed of two wastes which are defined as hazardous wastes in the RCRA regulations. One is creosote, hazardous

waste U051. 40 C.F.R. § 261.33.[1] The other is creosote sludge, hazardous waste K001. The regulations define hazardous waste K001 as "[b]ottom sediment sludge from the treatment of wastewaters from wood preserving processes that use creosote and/or pentachlorophenal." 40 C.F.R. § 261.32. IWC treated the wastewater from the wood preserving process when it placed the wastewater in its impoundments.[2]

IWC failed to notify the EPA by August 18, 1980, of the location and general description of its hazardous waste activity. Therefore IWC violated § 3010 of RCRA, 42 U.S.C. § 6930 on and after August 18, 1980.

3. IWC was not entitled to an exemption from the requirements of § 3010 of RCRA as a small quantity generator. Under § 3001(d) of RCRA, 42 U.S.C. § 6921, and the regulations thereunder at 40 C.F.R. § 261.5, the small quantity generator exemption applied in 1980 only to persons who generated less than 1,000 kilograms of hazardous waste in a month, and who stored no more than that amount on site. IWC did not meet this standard.

4. IWC failed to obtain a permit or interim status as required by § 3005 of RCRA. Section 3005 of RCRA, 42 U.S.C. § 6925(a), provides that any facility which treats, stores or disposes of hazardous waste, must either obtain a permit from the EPA or obtain interim status. IWC's hazardous waste activity constituted "treatment, storage, or disposal" of hazardous waste within the meaning of RCRA. "Treatment" of hazardous waste is defined as any "method" or "process" which is "designed to change the physical, chemical or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amena-

ble for recovery, amenable for storage, or reduced in volume." 42 U.S.C. § 6903(34). "Disposal" of hazardous waste is defined as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

IWC never obtained an RCRA permit for the treatment, storage or disposal of hazardous waste. IWC did not submit a Part A application under RCRA and did not obtain interim status under RCRA. Therefore IWC violated § 3005 of RCRA, 42 U.S.C. § 6925.

5. IWC violated the interim status requirements of § 3004 of RCRA. Section 3004 of RCRA, 42 U.S.C. § 6924, authorizes the EPA to promulgate rules governing owners and operators of hazardous waste treatment, storage or disposal facilities. Among the regulations is "Part 265—Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities." IWC was required to comply with the Part 265 standards even though it never achieved interim status. The standards apply to:

those owners and operators of facilities in existence on November 19, 1980 who have failed to provide timely notification as required by section 3010(a) of RCRA and/or failed to file Part A of the permit application....

40 C.F.R. § 265.1(b).

IWC, as the owner or operator of a facility that treats, stores, or disposes of hazardous waste, violated the following standards:

a. Before an owner or operator treats, stores, or disposes of any hazardous

---

1. The creosote-coal tar solution that IWC used in the wood treating process is hazardous waste U051, even though it is not pure creosote. The creosote grades used by the wood preserving industry are "technical grades" under the regulations. To be hazardous waste U051, creosote does not have to be the sole active ingredient in the technical grade. *See* 40 C.F.R. § 261.33(d).

2. The regulations also encompass the constituents from hazardous waste U051 and hazardous waste K001, *see* 40 C.F.R. § 261.3(c)(2)(i), which inspectors discovered at the IWC facility on September 10 and 11, 1985.

waste it must obtain a detailed chemical and physical analysis of a representative sample of the waste. 40 C.F.R. § 265.13.

b. Within one year after the effective date of these regulations, the owner or operator must implement a ground-water monitoring program capable of determining the facility's impact on the quality of ground water in the uppermost aquifer underlying the facility. 40 C.F.R. §§ 265.90 to 265.94.

c. The owner or operator must establish financial assurance for the closure of the facility through: a) a closure trust fund; b) a surety bond guaranteeing payment into a closure trust fund; c) a closure letter of credit; d) closure insurance; e) a financial test and corporate guarantee for closure; and f) use of multiple financial mechanisms. 40 C.F.R. §§ 265.140 to 265.150.

d. The owner or operator must prevent the unknowing entry, and minimize the possibility for the unauthorized entry, of persons or livestock onto the active portion of the facility. 40 C.F.R. § 265.14.

e. The owner or operator must inspect its facility for malfunctions and deterioration, operator errors, and discharges which may be causing—or may lead to: (1) release of hazardous waste constituents to the environment or (2) a threat to human health. 40 C.F.R. § 265.15(a).

f. The owner or operator must implement a program of classroom instruction or on-the-job training to teach its employees to perform their duties in a way that ensures the facility's compliance with the requirements of Part 265. 40 C.F.R. § 265.16.

g. The owner or operator must develop a contingency plan to minimize hazards resulting from fires, explosions, or unplanned releases of hazardous wastes. 40 C.F.R. §§ 265.50 to 265.56.

h. The owner or operator must maintain written operating records regarding the location and quantity of hazardous waste within the facility, records and results of waste analyses, results of inspections, and details of hazardous wastes received at the facility. 40 C.F.R. §§ 265.70 to 265.77.

i. The owner and operator must prepare and retain a written closure plan for the IWC facility. 40 C.F.R. § 265.112(b).

j. The owner and operator must maintain enough freeboard in its surface impoundments to prevent any overtopping of the dike by overfilling. 40 C.F.R. § 265.222(a).

k. The owner and operator must protect its waste pile from wind dispersal. 40 C.F.R. § 265.251.

6. Section 3008(h) of RCRA requires IWC to undertake corrective action. Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), provides that:

Whenever on the basis of any information the Administrator determines that there is or has been a release of hazardous waste into the environment from a facility authorized to operate under section 6925(e) of this title, the Administrator may issue an order requiring corrective action or such other response measure as he deems necessary to protect human health or the environment or the Administrator may commence a civil action ... for appropriate relief, including a temporary or permanent injunction.

This section applies to facilities such as IWC which have failed to obtain interim status.[3] Since there has been a release of hazardous wastes and hazardous constituents into the environment at the IWC facili-

---

3. On its face the section applies to facilities "authorized to operate under section 6925(e)." Section 6925(e) refers to the interim status provision of RCRA. However, the section must also apply to facilities that have failed to obtain interim status. Otherwise, facilities could gain exemption from the obligation to perform corrective action by failing to submit the forms necessary to obtain interim status. This would undermine congressional intent and be contrary to the EPA's interpretation of its corrective action authority.

ty, IWC is liable for corrective action pursuant to § 3008(h) of RCRA.

7. If any of the above conclusions of law shall subsequently be determined to constitute a matter of fact rather than a conclusion of law, they shall be treated as having been determined as a finding of fact. If any of the above findings of fact shall subsequently be determined to be a conclusion of law, they shall be treated as having been determined as a conclusion of law.

8. There is no genuine issue as to any material fact and the plaintiff United States of America is entitled to partial summary judgment on liability as a matter of law.

Accordingly, by reason of the foregoing, the Court hereby

GRANTS the motion of the plaintiff United States of America for partial summary judgment.

IT IS SO ORDERED.