UNITED STATES of America, Plaintiff,

v.

CLOW WATER SYSTEMS, A
DIVISION OF McWANE,
INC., Defendant.

No. C2–87–720.

United States District Court,
S.D. Ohio, E.D.

Dec. 19, 1988.

**1346**

D. Michael Crites, U.S. Atty., S.D. Ohio by James E. Rattan, Asst. U.S. Atty., Columbus, Ohio, Roger J. Marzulla, Asst. Atty. Gen., Land and Natural Resources Div. by Frederick S. Phillips, Environmental Enforcement Section, U.S. Dept. of Justice, Washington, D.C., for plaintiff; Marc Radell, Asst. Regional Counsel, U.S. E.P.A., Region V, Chicago, Ill., and Belinda Holmes, OECM—U.S. E.P.A., Washington, D.C., of counsel.

Joseph D. Lonardo, Columbus, Ohio, for defendant; John W. Hoberg and Elizabeth Sutor Bohanon, Vorys, Sater, Seymour and Pease, Columbus, Ohio, of counsel.

## MEMORANDUM AND ORDER

GRAHAM, District Judge.

The United States of America, represented in this case by the United States Environmental Protection Agency ("U.S. EPA"), commenced an action against Clow Corporation by complaint filed on June 11, 1987 to enforce certain provisions of the Resource Conservation and Recovery Act ("RCRA"). Subsequent to the filing of this action, Clow Corporation was acquired by McWane, Inc., and now does business under the name of Clow Water Systems ("Clow"), a division of McWane, Inc. An amended complaint was filed on August 1, 1988 to reflect this change.

Clow, a Delaware corporation, manufactures metal pipes and pipe fittings at a plant located in Coshocton, Ohio. The complaint alleges that Clow treats, stores and disposes of hazardous wastes as defined in 42 U.S.C. § 6903(5), and therefore falls within the requirements of RCRA. Specifically, plaintiff alleges that Clow treats and stores hazardous wastes in the form of lead and cadmium filtered through Clow's cupola emission control system and carried in wastewater to a surface impoundment facility. Plaintiff also alleges that Clow maintains a calcium carbide desulpherization slag pile, and stores drums of paint waste. The complaint alleges violations of RCRA on the part of Clow, as well as violations of the Consent Agreement and Final Order ("CAFO") entered into by Clow and U.S. EPA on September 18, 1985.

This matter is now before the court on plaintiff's motion for partial summary judgment filed on October 14, 1988 and on Clow's response and cross-motion for partial summary judgment filed on November 10, 1988. Plaintiff seeks summary judgment on the issue of Clow's liability for a majority of the violations alleged in the four counts of the amended complaint.

■ The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in light favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

*Loss of Interim Status*

Plaintiff first requests summary judgment on the issue of Clow's storage or disposal of hazardous waste in its surface impoundment despite loss of interim status, as alleged in Count Two of the amended complaint.

Congress enacted RCRA in 1976 to implement a program for the regulation of owners and operators of hazardous waste treatment, storage and disposal facilities. The owner or operator of a hazardous

waste facility must obtain a permit from U.S. EPA to operate the facility. 42 U.S.C. § 6925. However, since Congress realized that the permit process would not be completed prior to the effective date of the regulations, it further provided that facilities in existence on November 19, 1980 could operate on an interim basis if they applied for a permit and notified the U.S. EPA or other appropriate state agency of the nature of the hazardous wastes being stored, treated or disposed of at those facilities. 42 U.S.C. § 6925(e). It is undisputed that Clow was operating its facility prior to November 19, 1980 and that it made the application and disclosures required by 42 U.S.C. § 6925(e) for attaining interim status.

■ In 1984, Congress amended RCRA to add the Loss of Interim Status Provision ("LOIS"), 42 U.S.C. § 6925(e)(2). This provision terminates interim status for land disposal facilities on November 8, 1985 unless those facilities have submitted Part B permit applications and have certified compliance with applicable groundwater monitoring and financial responsibility requirements. Continued operation after loss of interim status exposes the facility to liability under the civil enforcement provisions of 42 U.S.C. § 6928(a).

In order to establish a violation of the LOIS provision, plaintiff must prove: 1) that Clow was the owner or operator of a "land disposal facility"; 2) that Clow did not have a permit or interim status to operate the facility; and 3) that Clow continued to operate its facility after the November 8, 1985 deadline. *See United States v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314 (D.S.C.1988). Clow has admitted that it is the operator of a facility which maintains a surface impoundment in which hazardous wastes are stored. The term "land disposal" includes the placement of hazardous waste in a surface impoundment. 42 U.S.C. § 6924(k). Clow also acknowledges that it continued to operate the surface impoundment after November 8, 1985, and that it did not have a permit.

Clow does disagree with plaintiff's claim that it lost interim status on November 8, 1985. Plaintiff claims that Clow failed to certify that it was in compliance with all financial responsibility requirements because it did not certify that it had obtained non-sudden accidental liability insurance required by 40 C.F.R. § 265.147(b). Clow admits that it was unable to secure the required insurance by November 8, 1985, and its certification letter of November 6, 1985 (Clow's Ex. E) states only that liability coverage for non-sudden accidental liability insurance has been applied for. Thus, Clow's certification demonstrates on its face that it was not in compliance with the requirements of 42 U.S.C. § 6925(e)(2).

Clow contends that the operation of § 6925(e)(2) is not automatic, and that its operation is dependent upon a notification of the facility by the U.S. EPA of loss of interim status. This interpretation is contrary to the precise wording of the statute, which provides that "interim status shall terminate" on November 8, 1985 unless the statutory requirements are met. It would also be contrary to the congressional intent to accelerate the EPA's enforcement activities, including final permit review of major land disposal facilities. *See* H.R.Rep. No. 198, 98th Cong., 2nd Sess., Pt. I, at 44, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5576, 5603.

Clow relies on *United States EPA v. Environmental Waste Control, Inc.*, 698 F.Supp. 1422 (N.D.Ind.1988) in which the court found summary judgment inappropriate in a case where the facility had certified that it had obtained the necessary insurance and the EPA challenged whether the policy limits complied with the regulatory requirements. This case is distinguishable, however, since it is undisputed that Clow did not have the necessary insurance as of November 8, 1985. The U.S. EPA has construed § 6925(e)(2) as requiring certification of compliance by November 8, 1985. The agency interpretation is entitled to deference as being reasonable and consonant with congressional intent. *Vineland Chemical Co. v. United States E.P.A.*, 810 F.2d 402, 409 (3d Cir.1987). The district court upon remand of the

*Vineland Chemical* case went on to hold that a facility's loss of status is automatic by operation of statute, and declined to differentiate between facilities who fail to certify at all and facilities whose certifications are later found to be deficient. *See United States v. Vineland Chemical Co., Inc.,* 692 F.Supp. 415 (D.N.J.1988).

Clow contends that it made a good faith effort to obtain insurance, but that insurance was difficult to obtain due to the nature of the insurance market prior to November 8, 1985. Clow points to the language in paragraph A(6) of the CAFO, which states, "Should Respondent become unable to comply with this requirement due to the unavailability of insurance, Respondent shall demonstrate that a good faith effort has been made and continues to be made to obtain said coverage." However, there is no language in the CAFO about such a good faith effort suspending the loss of interim status. As the court noted in *United States v. Allegan Metal Finishing Co.,* 696 F.Supp. 275 (W.D.Mich.1988), the U.S. EPA made clear by announcement in Fed.Reg. 33902, 33907 (Aug. 21, 1988) that its practice of using compliance schedules for obtaining insurance would not apply after November 8, 1985 and would not affect the certification requirements of the statute. Good faith effort is not a defense to liability after November 8, 1985. *T & S Brass,* 681 F.Supp. at 321.

Clow also advances the defense that it was impossible for it to obtain insurance prior to the statutory deadline due to the nature of the insurance market. Clow's impossibility defense may have some relevance to the nature of any relief given in this case, but does not bar the automatic loss of interim status. *Allegan Metal Finishing Co., supra* at 285. Clow could also have complied with the law by discontinuing use of its hazardous waste facilities, and thus it was not impossible to comply with the LOIS deadlines. *See T & S Brass,* 681 F.Supp. at 321.

The agreement entered into on July 16, 1985 between Clow and the Ohio EPA which included a schedule for compliance also had no impact upon Clow's loss of interim status. Clow has not contested plaintiff's statement that the Ohio EPA did not gain authorization under 42 U.S.C. § 6926(g) to administer the 1984 amendments to RCRA. In any event, the Ohio EPA Order provides that closure of the surface impoundment be in accordance with the interim status requirements of Ohio Administrative Code Chapters 3745–3766 and 40 C.F.R. Part 265. (Order Para. 6D, Clow's Ex. D, p. 20). The Order does not purport to relieve Clow of the obligation under 42 U.S.C. § 6925(e)(2) of certifying the appropriate financial responsibility requirements.

The court concludes that there is no genuine issue of material fact concerning Clow's loss of interim status on November 8, 1985, and that Clow treated, stored or disposed of hazardous wastes in its surface impoundment beyond that date without the permit required by 42 U.S.C. § 6925. Plaintiff is entitled to summary judgment on this issue.

*CAFO Violations*

Plaintiff alleges several violations of the CAFO between Clow and U.S. EPA in Count One of the amended complaint. By stipulation filed on November 29, 1988, certain of these alleged violations were withdrawn from this court's consideration in these summary judgment proceedings. Plaintiff now seeks summary judgment on the issue of liability for the violations alleged in paragraphs 25(b)(3), (4) and (5) and paragraph 25(d) of the amended complaint. A violation of an order issued pursuant to 42 U.S.C. § 6928(a) would render Clow liable for a civil penalty of up to $25,000 per day for each day of noncompliance.

The first alleged violation concerns the failure of Clow to prepare and submit a written closure plan for the drum storage area. Paragraph B(3) of the CAFO provides that within thirty days of the entry of the CAFO, Clow must:

> Prepare and submit a written closure plan pursuant to Ohio Administrative Code 3745–66–12 for the closure of the unpermitted drum storage area now in existence. This plan shall provide for removal and disposal of all such drums

and contaminated soils at a RCRA treatment or disposal facility which is permitted or has achieved interim status. Respondent shall close the facility in accordance with the plan within 90 days of U.S. EPA's approval of the plan.

According to the first affidavit of Paul Dimock, Chief of U.S. EPA, Region V, Enforcement Programs Section for Illinois, Wisconsin and Michigan, (Plaintiff's Motion for Partial Summary Judgment, Ex. H) Clow presented a written closure plan for the drum storage area on October 23, 1985. However, he found the plan and cost estimate to be inadequate because the plan did not provide for offsite disposal at a licensed RCRA facility as required by the CAFO. Mr. Dimock further states that he notified Clow by letter dated May 7, 1986 that the submission was inadequate. Clow submitted a revised closure plan and cost estimate on June 19, 1986. Comments on this submission were provided to Clow in an Ohio EPA letter dated February 6, 1987. Clow submitted further revisions to its plan on February 26, 1987, and U.S. EPA approved the revised plan on May 8, 1987. According to Mr. Dimock's affidavit, the drum storage area has now been closed.

Exhibit 1 to the first Dimock affidavit includes Clow's submitted closure plan of October 23, 1985. That plan provided for charging the drums, which contained asphalt paint waste, in Clow's cupola, and estimated the cost to be $13,000 for this process. The deposition of Edward Leach, an engineering manager for Clow, reveals that burning the drum wastes in the cupola was suggested as being more economical and environmentally sound "even though it was not absolute compliance with the consent agreement." (Leach Depo., p. 124–125).

■ The court finds that there is no genuine issue of material fact in regard to this CAFO violation. The terms of the CAFO called for a closure plan which provided for disposal of the drums of paint waste at a RCRA-permitted facility. Clow's proposal for disposing of the waste in its own cupola did not satisfy this requirement of the CAFO. Clow did not submit a plan calling for disposal at an approved RCRA facility until June 19, 1986. Therefore, until that date, Clow was in violation of the terms of the CAFO paragraph B(3).

■ Plaintiff next alleges that Clow violated paragraph B(4) of the CAFO, which required Clow to prepare and submit a written estimate of the cost of closing the unpermitted drum storage area in accordance with the closure plan pursuant to 40 C.F.R. § 265.142. Clow did submit a cost estimate with its proposed closure plan of October 23, 1985. However, that cost estimate related to a plan which did not comply with the CAFO since it did not provide for off-site disposal at a RCRA facility. The cost estimate was thus inadequate. In addition, the estimate was not in accordance with 40 C.F.R. § 265.142(a)(2), which provides that the "closure cost estimate must be based on the costs to the owner or operator of hiring a third party to close the facility." Clow's proposal (First Dimock Aff.Ex. 1) does not include such a provision. There is no genuine issue of material fact concerning Clow's violation of this provision of the CAFO. Clow did not provide a revised estimate until June 19, 1986, when it submitted a plan for off-site disposal. Thus, Clow was in violation of CAFO paragraph B(4) until that date.

Plaintiff alleges in paragraph 25(b)(4) of the amended complaint that Clow failed to establish financial assurance for closure of the drum storage area. Paragraph B(5) of the CAFO requires that Clow, within thirty days of the entry of the CAFO, establish "financial assurance relating to closure of the unpermitted drum storage area pursuant to 40 C.F.R. 265.143." According to the first affidavit of Paul Dimock, Clow has never provided U.S. EPA with financial assurances relating to the closure of the drum storage area, although that area has now been closed. Clow notes its response to Plaintiff's Request for Admissions, No. 51, which states that Clow demonstrated financial assurance for closure of the drum storage area by letter to the EPA dated October 24, 1985. Since no letter bearing that date has been filed with the record, the court assumes that Clow was referring

to its letter of October 23, 1985, in which Jack R. Kanuckel indicated that financial assurance was being submitted under separate cover. There is a subsequent reference in Mr. Kanuckel's letter of May 23, 1986 (Exhibit 2, Plaintiff's Motion for Partial Summary Judgment) at paragraph F of the attachment, to a letter of financial assurance being sent to U.S. EPA, Region VII, on April 25, 1986. However, the actual financial assurance document has not been filed here, and it has not been established that it related to the drum storage area.

In regard to the October 23, 1985 letter, the separate document relating to financial assurance has not been proffered. However, financial assurances offered in connection with an on-site closure plan with an estimated cost of $13,000 would not establish financial assurance for an off-site disposal plan at a RCRA-approved facility. This conclusion is supported by the fact that Clow's later estimate for closure costs at a RCRA-approved facility ranged between $140,000 and $180,000. The court finds that Clow has not demonstrated a genuine issue of material fact regarding its failure to provide financial assurance for closure of the drum storage area.

The next alleged CAFO violation concerns paragraph B(6) of the CAFO, which provides that Clow shall:

> Maintain liability coverage for sudden and non-sudden accidental occurrences pursuant to Ohio Administrative Code 3745–66–45. Should Respondent become unable to comply with this requirement due to the unavailability of insurance, Respondent shall demonstrate that a good faith effort has been made and continues to be made to obtain said coverage. Such good faith effort shall, at a minimum, consist of submitting timely applications for coverage to known suppliers of sudden and non-sudden liability insurance. Respondent shall provide to U.S. EPA copies of these applications along with the responses of each insurance company contacted. If Respondent is denied coverage, the insurance company's denials should clearly state the reasons for the denial. Respondent shall also provide documentation of all contacts made in an effort to locate known suppliers. Failure to try to locate suppliers and/or submit applications to known suppliers shall be construed as a lack of a good faith effort to obtain insurance and a violation of this Order.

According to the first affidavit of Paul Dimock, Clow did not notify U.S. EPA that it has maintained liability coverage for sudden and non-sudden accidental occurrences, and did not submit documentation to demonstrate a good faith effort to obtain coverage. Clow submitted a letter dated November 6, 1985 certifying that Clow had demonstrated coverage for sudden accidental occurrences through the certificate mechanism of 40 C.F.R. § 265.147(b)(1)(i). Clow does not contest the fact that it has not obtained non-sudden liability insurance coverage. Clow contends that it complied with the good faith provisions of the CAFO. Plaintiff contends that Clow failed to present documentation as required by the CAFO.

The record reveals that by letter dated October 23, 1985, Clow notified U.S. EPA that it had applied for liability insurance coverage to National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and had contracted for an environmental risk assessment from Risk Science International. (First Dimock Aff., Ex. 1). By letter dated May 23, 1986, Clow responded to U.S. EPA's statement of alleged CAFO violations by further describing efforts to obtain a satisfactory risk evaluation statement, and noted that copies of its correspondence were enclosed as documentation. However, such correspondence has not been made a part of this record. By letter dated November 6, 1985, Clow stated that it had applied for non-sudden liability coverage through Rollins, Burdick, Hunter of Illinois, Inc. Clow has also submitted the deposition testimony of Russell Leinbach and Ronald Anderson regarding the difficulty of obtaining liability insurance, and the deposition of Edward Leach, in which Mr. Leach testified concerning Clow's efforts to obtain insurance through an insurance broker and through Rollins, Burdick

and Hunter. Thus, Clow has produced some evidence of efforts to obtain insurance. However, Clow has not shown that it complied with the CAFO requirement that "Respondent shall provide to U.S. EPA copies of these [insurance] applications along with the responses of each insurance company contacted." Clow has also failed to show that it did "provide documentation of all contacts made in an effort to locate known suppliers." To this extent, there is no genuine issue of material fact as to Clow's noncompliance with the CAFO.

Plaintiff's final alleged CAFO violation concerns paragraph C(2) of the CAFO. This provision requires Clow, within forty-five days of the entry of the CAFO, to submit a sampling and analysis plan for an area three hundred by three hundred foot which was permitted as a landfill but which Clow later indicated was used to maintain a waste storage pile. In an effort to comply with this provision, Clow submitted test results from samples taken around its calcium carbide slag pile. U.S. EPA found that this did not satisfy the CAFO, in that the slag pile did not cover the same area as the three hundred by three hundred foot landfill referred to in the CAFO. Clow submitted a plan relating to the three hundred by three hundred foot area on June 19, 1986. The plan was examined by Robert Swale of the Technical Programs Section, and Mr. Swale determined that the testing methods set forth in the plan did not meet the requirements of the CAFO. Clow was notified of the deficiencies by letter dated December 23, 1986. Clow submitted a new plan for sampling and analysis on January 27, 1987, and this revised plan was approved with conditions on May 12, 1987.

In support of its position that the original October 23, 1985 submission did not relate to the same three hundred by three hundred foot area referred to in the CAFO, plaintiff submitted a second affidavit of Mr. Dimock in which he stated that he had knowledge of the Part A permit application filed by Clow, including a map indicating the location of the original three hundred by three hundred foot area. (Second Dimock Aff., Ex. 2, Plaintiff's Reply). Mr.

Dimock further stated that Clow submitted a map with their revised application which showed the location of the calcium carbide desulphurization slag pile in question, and which showed that the slag pile overlapped but was not coextensive with the landfill area. Mr. Dimock also stated that he had personally viewed the Clow facility, and that plant personnel pointed out the overlapping but distinct waste pile and landfill areas.

Clow notes the answers given by Clow to plaintiff's interrogatories and requests for admissions, in which Clow stated that the sampling and analysis performed on the calcium carbide waste pile and submitted by Clow on October 23, 1985 complied with the CAFO. The document in question, included in Exhibit 1 to the first Dimock affidavit, states simply that the slag waste pile had been sampled and tested and did not contain any reactive material. Clow has presented no evidence to show that the calcium carbide desulphurization slag pile referred to in the October 23, 1985 letter was coextensive with the landfill mentioned in the CAFO. In paragraph H of Clow's letter of May 23, 1986 (First Dimock Affidavit, Ex. 2), Clow states that the three hundred by three hundred foot area encompasses only a small part of the slag pile; Clow felt that since the area around the slag pile was most likely to contain reactive waste, this area alone should be tested. Clow stated at the hearing on the motions for summary judgment that there was a misunderstanding on the part of Clow as to what the terms of the CAFO required.

The court concludes that no genuine issue of fact has been shown concerning Clow's failure to submit a sampling and analysis plan for the three hundred by three hundred foot landfill area. The record suggests that Clow had a different view than the U.S. EPA as to what would constitute appropriate testing for the slag pile area in terms of revealing the presence of hazardous wastes in the area and acted accordingly. It is uncontroverted that Clow did not present a sampling and analysis plan for the three hundred by three

hundred foot area until June 19, 1986, contrary to the requirements of the CAFO.

In summary, the court finds that plaintiff is entitled to summary judgment on the issue of Clow's violation of CAFO paragraphs B(3), (4), (5) and (6) and C(2).

*Drum Storage Area*

Plaintiff alleges in Count Three of the amended complaint that Clow violated several regulations governing its storage area for drums of containers which contained pipe coating material residue in the form of asphalt paint wastes. These wastes are alleged to be hazardous wastes because some of the drums when tested demonstrated the characteristic of ignitability, 40 C.F.R. § 261.21. Plaintiff alleges that Clow failed to transfer wastes from leaky containers in violation of 40 C.F.R. § 265.171 and the CAFO, and failed to assure that the containers were always kept closed except when necessary to add or remove waste, in violation of 40 C.F.R. § 265.173 and the CAFO. Plaintiff also alleges that Clow violated 40 C.F.R. § 265.112 and the CAFO by failing to submit an adequate closure plan.

Plaintiff has submitted a portion of the deposition of Jack Kanuckel, Clow's Vice President and General Manager, in which he was questioned concerning photographs of paint drums taken on September 24, 1980 which showed the drums in disarray. (Plaintiff's Reply, Ex. 3). Mr. Kanuckel admitted having seen upset drums and acknowledged the photographs in light of the signature of Paul Rea of Clow on the back. Mr. Kanuckel testified that the drums were not maintained in a better condition, with labels and tops closed until August of 1985, and that waste was stored in open containers until 1985. Photographs taken at the Clow facility are included in Exhibit 3.

Plaintiff also filed the deposition testimony of William A. Stephens, who stated that he observed drums at the Clow facility which were open with no covers, or which had holes or dents, with signs of leaking. He was shown a photograph of a part of the drum storage area allegedly taken in March of 1987, but not identified. Mr. Stephens recalled the drums in that area

being on pallets, but stated that the photograph was typical of what he had observed in 1984, showing some drums without covers, with standing water or debris, and with dents or holes near the top. (Plaintiff's Reply, Ex. 4).

Plaintiff has also submitted Clow's responses to its requests for admissions and interrogatories. In response to Interrogatory 32, Clow stated: "Clow has stored asphaltic paint wastes in drums or containers at the Coshocton facility. Some of these wastes may be hazardous wastes." Interrogatory 33 requests the "time periods during which such drums or containers were used to store or dispose of hazardous waste, hazardous waste constituents, or substances containing those materials at the Coshocton facility." The response was "all times relevant hereto." In response to Admission 19, which states "the paint waste and solvents in the drums displays the characteristic of ignitability," Clow responded "Deny. Some of the paint wastes may display or may have displayed the characteristic of ignitability." Clow admitted in Admissions 21, 22, and 23 that since November 19, 1980, some of the drums have leaked, overflowed or spilled, or were kept open, and the wastes have not always been transferred from drums in poor condition.

■ Upon consideration of the evidence submitted, the court finds that genuine issues of fact remain as to whether Clow violated the regulatory provisions and the CAFO as alleged in Count Three, or assuming that Clow has violated those provisions, the time those violations occurred. While counsel for Clow conceded at the hearing on the motions for summary judgment that some of the paint waste drums did display the characteristic of ignitability when tested, it is not clear whether these were the drums which were improperly stored, or when drums containing hazardous waste were stored. The only violation concerning the drum storage area about which no genuine issue of fact has been presented is Clow's failure to timely submit a closure plan for the drum storage area which complied with the CAFO, as previously dis-

cussed with the other CAFO violations alleged in Count One.

Clow alleges that the CAFO agreement bars this enforcement action under the doctrine of *res judicata,* since the CAFO was meant to address in part the violations asserted in regard to the drum storage area. However, the court finds that granting summary judgment to defendant on this point would be inappropriate in light of the unresolved questions surrounding the drum storage area. Both parties refer to the decision in *United States v. Allegan Metal Finishing Company, supra.* (Plaintiff's Motion for Partial Summary Judgment, Ex. F). In that case, the court found that a defendant which was charged with violations which occurred after the entry of a CAFO and which had violated the terms of the CAFO could not prevail on a *res judicata* defense, but the court recognized that a *res judicata* defense might be appropriate under some circumstances. Here, the court has found that no genuine issue of fact remains concerning Clow's violation of some provisions of the CAFO, but it is not clear from the complaint whether the plaintiff is seeking penalties for violations which occurred prior to as well as after the entry of the CAFO. The court finds that it is necessary to wait for further development of the record before deciding the merits of Clow's *res judicata* argument.

Plaintiff's motion for partial summary judgment and Clow's cross-motion for partial summary judgment regarding the alleged improper handling of hazardous wastes in the drum storage area are denied.

*Interim Status Corrective Action*

Plaintiff's final claim, as set forth in Count Four of the amended complaint, is that hazardous wastes or constituents have been released into the environment around Clow's facility, and that Clow is liable under the interim status corrective action provision in 42 U.S.C. § 6928(h). Section 6928(h)(1) provides:

> Whenever on the basis of any information the Administrator determines that there is or has been a release of hazardous waste into the environment from a facility authorized to operate under section 6925(e) of this title, the Administrator may issue an order requiring corrective action or such other response measure as he deems necessary to protect human health or the environment or the Administrator may commence a civil action in the United States district court in the district in which the facility is located for appropriate relief, including a temporary or permanent injunction.

Plaintiff has submitted a determination by the regional administrator of U.S. EPA, Region V, that there has been a release of hazardous wastes or hazardous waste constituents into the environment around the Clow facility. (Plaintiff's Motion for Partial Summary Judgment, Ex. I). Regional Administrator Adamkus noted in this determination that samples taken from groundwater monitoring wells in May and October of 1986 showed elevated levels of arsenic, phenols and total organic halides. The regional administrator found that Clow's surface impoundment or other hazardous waste management units were the likely source of groundwater contaminants, and that corrective action was necessary to protect human health and the environment from the effect of the hazardous waste/hazardous constituents being introduced into the environment.

The record also indicates that Clow admitted that water from the surface impoundment was infiltrating the underlying substrate and migrating out of the surface impoundment. (Admission No. 14). Plaintiff has submitted the deposition testimony of Mr. Leach, in which Mr. Leach states that flourides, sulphates, lead, cadmium, arsenic, selenium and cyanide were detected in monitoring wells at Clow's facilities, and that such substances were traceable to the quenching of the carbide slag pile. (Plaintiff's Motion for Partial Summary Judgment, Ex. D). Mr. Leach also stated that cracks were found in the bottom of the "tank" sometime in 1986, and a new bottom was put in the tank. (It is not clear from the portion of the deposition submitted what the precise nature of this

"tank" was, but it was mentioned in conjunction with the carbide slag pile).

The affidavit of James Saric, a geologist for U.S. EPA, indicates that Mr. Saric reviewed documents relating to groundwater testing in the vicinity of Clow's facility. (Plaintiff's Reply, Ex. 5). Mr. Saric stated in his affidavit that the leachate which results from the treatment of the calcium carbide desulphurization slag treatment bunker with water contains arsenic, phenolic compounds and other organics. He further stated that groundwater test results submitted by Clow on August 25, 1988 and November 13, 1986 indicated elevated levels of arsenic, phenols and total organic halides. These samples were obtained from two wells, C3 and C3R, located downgradient and adjacent to the treatment bunker, and Mr. Saric concluded that since leachate from the treated slag would likely contain the same hazardous wastes found in the two wells, a release of hazardous wastes into the environment had occurred at Clow. Mr. Saric also reviewed reports for January 21, 1988 and June 6, 1988 for well C3R, in which elevated levels of phenol and phenolic compounds, arsenic and cyanide were found, and he considered these reports as further indication of a release of hazardous waste and hazardous waste constituents.

Mr. Saric further states in his affidavit that typical wastewater from Clow's surface impoundment would include benzene, lead, cadmium and phthalates. A January 21, 1988 report concerning samples from well A–7, downgradient from the surface impoundment, indicated that cyanide was detected. Benzene and Bis (2–ethylhexyl) phthalate were found in wells surrounding the surface impoundment, and benzene was detected in well B0, downgradient of the surface impoundment. A June 6, 1988 report revealed that benzene was detected in wells downgradient of the surface impoundment, and lead and cadmium were detected in wells at the surface impoundment boundary. Mr. Saric concluded that a release of hazardous constituents from the surface impoundment had occurred. Mr. Saric also stated in his affidavit that Clow is underlain by an eighty-five foot sand and

gravel acquifer which is used as a source of drinking water in the area, and that wastewater losses result from infiltration through the soils underlying the surface impoundment and into the sand and gravel acquifer.

Plaintiff has also submitted the affidavit of Dale Helmers, who was employed by U.S. EPA from November, 1985 until December, 1987. Mr. Helmers stated that he reviewed reports of groundwater testing of samples obtained in May of 1986 from well C–3, downgradient of the surface impoundment. The samples contained arsenic at a concentration of 4.26 mg/1, phenol (1.4 mg/1) and total organic halides (.13 mg/1). Hazardous waste or constituents which migrate from the surface impoundment might be found in this well. Mr. Helmers further stated that samples from well C–7, representative of background or natural conditions, did not contain detectible levels of those substances.

Mr. Helmers also reviewed test results from samples obtained from well C3R in October, 1986. These samples contained arsenic (14.4 mg/1), phenols (1.2 mg/1), and total organic halides (.005 mg/1). Mr. Helmers stated that arsenic is a hazardous constituent with a maximum contaminant level for drinking water supplies of .05 mg/1. Total organic halides are an indicator of groundwater quality designed to detect the presence of halogenated organic compounds. Mr. Helmers concluded that there had been a release of hazardous waste or constituents from Clow's surface impoundment or another waste management unit near well C3, and that the release posed a threat to human health or the environment.

Clow does not contest the validity of the groundwater test results, nor does it present any evidence to indicate that the source of these chemicals was something other than its waste management units. Clow's argument rests upon the wording of 42 U.S.C. § 6928(h), which contains the phrase "hazardous waste" but not "constituents." Clow points to 42 U.S.C. § 6924(u), an analogous enforcement provision relating to permitted facilities, which

does contain the words "hazardous waste or constitutents." Clow argues that this difference in the statutory wording indicates an intent on the part of Congress to authorize agency action only in cases of release of hazardous wastes by interim status facilities, while allowing action for release of hazardous wastes and constituents by facilities which have been through the permit process. Clow further contends that the materials presented by plaintiff show at most a release of hazardous constituents into the environment, not a release of hazardous waste.

The term "hazardous waste" is defined in 42 U.S.C. § 6903(5) as:

... [a] solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

Hazardous wastes are those solid wastes listed in Subpart D of Part 261 and solid wastes which exhibit the characteristics of ignitability, corrosivity, reactivity, and EP toxicity. 40 C.F.R. §§ 261.03, 261.21–261.-24. Clow does not contest that the calcium carbide desulphurization slag pile contains hazardous waste based upon its characteristic of reactivity. Clow also agrees that wastewater channeled from its cupola emission control system into its surface impoundment contained emission control dust which included lead and cadmium, in such levels as to render it EP toxic.

Hazardous constituents are those toxic constituents listed by the Administrator in Appendix VIII of Part 261 which have been shown in scientific studies to have toxic, carcinogenic, mutagenic or teratogenic effects on humans or other life forms. 40 C.F.R. § 261.11(a). Substances detected in Clow's monitoring wells, including arsenic, phenol, cyanide, benzene, Bis (2–ethylhexyl) phthalate, lead and cadmium, are included in Appendix VIII. Clow contends that there has been no showing that those hazardous constituents were found in such concentrations in the environment so as to satisfy the regulatory definition of hazardous waste, i.e., that they exhibit one of the characteristics of hazardous wastes. However, the evidence reveals that at least one test of groundwater samples, specifically samples from well C3R in October of 1986, showed arsenic in a concentration of 14.4 mg/1, which exceeds the 5.0 mg/1 level for EP toxicity in Table I of 40 C.F.R. § 261.24. (Helmers Aff., Para. 7).

Insofar as the test results do not reveal levels of concentration high enough to satisfy the criteria for EP toxicity, plaintiff argues that Clow is nonetheless liable under § 6928(h). Plaintiff's position is that the omission of the word "constituents" from § 6928(h) was inadvertent and that Congress intended for the provisions of § 6928(h) to apply to the release of hazardous constituents from interim facilities. On December 16, 1985, the U.S. EPA announced by internal memorandum that § 6928(h) [RCRA § 3008(h)] would be interpreted to encompass "hazardous constituents" within the term "hazardous waste." It is the stance of U.S. EPA that Congress did not intend for the U.S. EPA to have a more narrow enforcement authority when dealing with interim facilities than with permanent facilities.

Section 6928(h) was enacted as part of the 1984 Amendments to RCRA to address the problem of monitoring interim status facilities. The House Conference Report No. 98–1133, pp. 110–111, 98th Cong. 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 5681–5682, notes the time-consuming nature of the permit process under RCRA, and states, *Id.* at 5682:

EPA should have the power to deal directly with an ongoing environmental problem without awaiting issuance of a final permit. Accordingly, this section has been added to the statute to allow EPA to seek corrective action for release of hazardous waste into the environment through an administrative order or

through a civil action in Federal district court. Such relief may include seeking a temporary or permanent injunction but is not limited to those forms of relief.

The use of orders and civil suits overcomes the slowness of the permit process without sacrificing the need for interaction between the Agency and the owner or operator in developing appropriate corrective action measures. For example, the first stage of Agency action under this provision might very well be an order requiring the owner or operator to characterize the extent of contamination of the ground water by hazardous constituents and to submit a corrective action plan....

The reference to "hazardous constituents" in the report lends support to plaintiff's interpretation of the statute and congressional intent. There is no indication in the legislative history that Congress intended that the EPA have less authority in addressing problems involving hazardous wastes or constituents which occur in interim facilities rather than permitted facilities.

The view of EPA, the agency charged with administering the statute, is entitled to considerable deference where Congress has not clearly expressed a contrary intent, and where the agency interpretation of the statute is a rational one. *Chemical Manufacturers Association v. Natural Resources Defense Council*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *National–Southwire Aluminum Co. v. U.S. EPA*, 838 F.2d 835 (6th Cir.1988). Here, there is no indication in the legislative history that Congress deliberately intended to curtail agency authority over the release of hazardous constituents in interim facilities and in fact, the House Conference Report suggests the contrary.

■ The U.S. EPA's interpretation of § 6928(h) is also reasonable in light of the agency's regulations. Hazardous constituents are by regulatory definition substances scientifically shown to have toxic, carcinogenic, mutagenic or teratogenic effects on humans or other life forms. 40 C.F.R. § 261.11(a). Thus, hazardous constituents may pose a substantial present or potential hazard to human health or the environment so as to fall within the definition of hazardous waste. The fact that Congress included the word "potential" in § 6903(5) indicates that Congress did not intend to limit agency action to accumulations of hazardous constituents which pose an actual present threat to human health or the environment. At least one court, without specifically addressing the statutory interpretation issue, has found a facility liable under § 6928(h) for "a release of hazardous wastes and hazardous constituents into the environment ..." *United States v. Indiana Woodtreating Corp.*, 686 F.Supp. 218, 223 (S.D.Ind.1988). The court finds that the agency interpretation of § 6928(h) is rational and not contradicted by any clear indication that Congress intended a different result.

In this case, plaintiff has produced evidence that hazardous constituents in levels above those considered acceptable for drinking water have been found in groundwater testing wells around Clow's facility, which is located over an acquifer used for drinking water in the area. The regional administrator of U.S. EPA made the determination that corrective action was necessary to protect human health and the environment from the effect of the hazardous waste and hazardous constituents. Clow has presented no evidence to contest plaintiff's evidence that hazardous waste and constituents have been released into the environment from Clow's hazardous waste surface impoundment and slag pile, nor has it presented any evidence to contest the regional administrator's determination or to suggest that it was in any way arbitrary and capricious or unsupported by the evidence.

The court concludes that Clow is liable under § 6928(h) for corrective action and that no genuine issue of material fact exists in that regard.

*Summary*

In accordance with the foregoing decision, plaintiff's motion for partial summary judgment is granted in part and denied in

part. Defendant's cross-motion for summary judgment is denied.