**UNITED STATES of America, Plaintiff,**

v.

**T & S BRASS AND BRONZE WORKS, INC., Defendant.**

**Civ. A. No. 87–1190–3.**

United States District Court,
D. South Carolina,
Greenville Division.

Jan. 27, 1988.
As Amended March 10, 1988.

Dianne M. Shawley, U.S. Dept. of Justice, for plaintiff.

Roger Florio, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, S.C., for defendant.

## ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

This action was brought on behalf of the United States Environmental Protection Agency ("EPA") under the Resource Conservation and Recovery Act, as amended ("RCRA"), 42 U.S.C. § 6901 *et seq.* The United States alleges that T & S violated section 3005 of RCRA by failing to certify its compliance with the financial responsibility requirements of RCRA and by continuing to operate its hazardous waste land disposal facility, without interim status or the required RCRA permit, after the November 8, 1985, statutory deadline. The United States seeks injunctive relief and civil penalties.

## STATUTORY AND REGULATORY FRAMEWORK

In 1976, the United States Congress enacted RCRA, which established a comprehensive, "cradle-to-grave" hazardous waste program that was to be administered by EPA. RCRA sets forth certain guidelines regulating the owners and operators of hazardous waste treatment, storage and disposal facilities ("TSD" facilities). 42 U.S.C. §§ 6921–25.

Under RCRA § 1004(5), hazardous wastes are defined as "those wastes which cause, or significantly contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible illness, or which pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed." 42 U.S.C. § 6903(5). EPA's regulations governing the identification of hazardous wastes are found within 40 C.F.R. Part 261, Subparts B, C, and D. These regulations contain two categories of hazardous

wastes, "listed" and "characteristic." Those wastes which have been determined to be hazardous by definition have been assigned certain identification numbers and are referred to as "listed wastes." "Characteristic hazardous wastes" are defined by certain criteria which identify components of wastes which render those substances as hazardous waste.

The federal government may grant individual states the right to administer and enforce their own hazardous waste programs under RCRA. A state program must be either substantially equivalent ("interim authorization") or equivalent ("final authorization") to the federal program. 42 U.S.C. § 6926. Under 42 U.S.C. § 6928(a)(2), EPA still retains authority to enforce the RCRA based program notwithstanding its delegation of enforcement authority to a state. The State of South Carolina received primary authority to administer and enforce its own RCRA program on November 8, 1985.[1]

Section 3005 of RCRA, 42 U.S.C. § 6925, requires every owner or operator of a TSD facility to obtain a permit to operate the facility. Congress realized that it would be impossible to issue permits to all hazardous waste facilities before the permit program became effective and therefore provided a mechanism whereby TSD facilities could operate under "interim status." Under RCRA § 3005, a facility must meet the following criteria to achieve interim status: (1) be in existence on November 19, 1980, or the effective date of the statutory or regulatory changes that render the facility subject to the permit requirement; (2) be in compliance with the preliminary notification requirements of RCRA § 3010(a), 42 U.S.C. § 6930(a); and (3) file Part A of its permit application. Facilities which failed to provide notice by submitting their Part A applications ("non-notifiers") never received interim status. EPA's regulations, however, required non-notifiers that wished

to remain in operation to comply with the same requirements which apply to interim status facilities. 40 C.F.R. § 265.1(b). Hazardous waste facilities with interim status must comply with the regulations governing treatment, storage and disposal of hazardous wastes. 40 C.F.R. Part 265.

In 1984 Congress amended RCRA to add section 3005(e), the Loss of Interim Status ("LOIS") Provision. 42 U.S.C. § 6925(e).[2] This provision provides that all existing hazardous waste land disposal facilities would automatically lose interim status unless they certified before November 8, 1985, that they were in compliance with all applicable RCRA requirements, and also submitted Part B of their permit application. This provision was adopted to encourage compliance with the basic requirements of the interim status regulations, particularly the groundwater monitoring and financial responsibility requirements.

RCRA § 3005(e)(2) provides:

In the case of each land disposal facility which has been granted interim status under this subsection before November 8, 1984 *interim status shall terminate on the date twelve months after November 8, 1984 unless the owner or operator of such facility —*

(A) applies for a final determination regarding the issuance of a permit under subsection (c) of this section for such facility before the date twelve months after November 8, 1984; and

(B) certifies that such facility is in compliance with all applicable groundwater monitoring and financial responsibility requirements.

42 U.S.C. § 6925(e)(2) (emphasis added).

Land disposal facilities which did not meet these requirements would be required to close the unit in question.

Two types of financial responsibility are

---

1. Although South Carolina has primary enforcement authority, the EPA retains the right to conduct inspections and make information requests under RCRA § 3013 and to take enforcement action under RCRA §§ 3008, 3018 and 7003.

2. Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98–616, § 213(a), 98 Stat. 3221 and 3241 (hereinafter, "HSWA").

required for hazardous waste facilities.[3] All owners and operators of hazardous waste facilities in South Carolina must demonstrate and maintain (1) financial assurance for proper closure of the facility and, in the case of disposal facilities, post-closure care of the facility, and (2) liability insurance coverage for personal injury and property damage claims resulting from sudden accidental occurrences at the facility. Liability insurance coverage for non-sudden accidental occurrences is also required for facilities which practice land disposal of waste. *See* South Carolina regulations at R. 61–79.265.143, R. 61–79.265.145, R. 61–79.265.147, and 40 C.F.R. Part 265, Subpart H.

The United States' lawsuit is based upon T & S Brass' alleged violation of the RCRA § 3005 requirements. In order to establish defendant's liability for loss of interim status under RCRA § 3005(e), the United States must prove the following elements:

1. That T & S Brass was the owner and/or operator of a "land disposal facility;"

2. That T & S Brass had neither a permit nor interim status to operate its facility; and

3. That T & S Brass continued to operate its facility after the November 8, 1985, statutory loss of interim status deadline.

### FINDINGS OF FACT

T & S is a South Carolina corporation which manufactures industrial plumbing fixtures for use in laboratories, hospitals and food service. The manufacturing process requires a technique called electroplating whereby the fixtures are coated with various metals.[4] During this process approximately 21,000 gallons of electroplating wastewater per day is produced and then stored and/or disposed of in an "on-site" surface impoundment.

The use of an on-site surface impoundment by T & S Brass for the storage and disposal of its electroplating wastewater treatment sludges began in 1979. This sludge, designated "F006" under the RCRA regulations, is a federally regulated hazardous waste. 40 C.F.R. Part 261. Even though T & S alleges that its surface impoundment was constructed only to receive overflows of electroplating wastewater from its collection well, where it initially collected, T & S admits that sometime prior to August 1980, it purposefully precipitated F006 sludge in the surface impoundment. T & S continued to store this F006 sludge in its impoundment at least until an October 12, 1983, inspection of the facility. Evidence presented at trial showed that T & S Brass removed all the F006 sludge from its surface impoundment on or before April 24, 1984.

At trial the United States proved that T & S Brass intentionally and routinely discharged electroplating wastewater into its surface impoundment from November 19, 1980, until May 21, 1986. Plaintiff's environmental engineer provided expert testimony at trial that F006 sludge accumulated in defendant's surface impoundment as a result of defendant's introduction and storage of electroplating wastewater in the impoundment.[5] This conclusion is supported by an admission to this effect by T & S Vice–President, Claude I. Theisen in a letter dated April 24, 1984 (Exhibit D–15). In that letter Theisen stated that although T

---

3. The South Carolina financial responsibility regulations became effective in July, 1983. Under RCRA § 3008(a)(2), 42 U.S.C. § 6928(a)(2), these regulations may be enforced by the Federal government as well as the state. *United States v. Conservation Chemical Co. of Illinois,* 660 F.Supp. 1236, 1244–45 (N.D.Ind.1987).

4. Two wastewater streams are produced by the electroplating process, a chromate stream and a nickel stream. Before being mixed with wastewater from nickel plating, the chromate wastewater is treated to reduce the chromium from a hexavalent to a trivalent state. This is done by

lowering the pH of the wastewater and adding sodium bisulfate. This wastewater then goes to the collection well. When the amount of wastewater coming into the well exceeds the well's 2100 gallon capacity, the wastewater overflows into the surface impoundment. Since the facility produces an average of 21,000 gallons of wastewater a day, electroplating wastewater flows into the surface impoundment on a routine basis. Transcript pp. 2–8, 2–9.

5. Transcript pp. 107–109, 118–121.

& S had pumped the sludge out of the surface impoundment sometime prior to April 24, 1984, additional sludge had formed in the impoundment. Defendant's engineer testified at trial that as of November 8, 1985, when T & S filed its Part B permit application [6], approximately 30,000 gallons of F006 sludge were contained in defendant's impoundment. (Transcript p. 2–11, 2–12). Thus the Court finds that T & S' routine introduction of wastewater into the surface impoundment continued to add to the total accumulation of F006 sludge in the bottom of the impoundment. Based upon this evidence, the Court finds that from November 19, 1980, until May 21, 1986, T & S Brass routinely used its surface impoundment to treat, store and/or dispose of F006 sludge.

According to testimony at trial, in February 1985, James R. Brooks, Jr., an environmental engineer, was retained by T & S Brass to determine the regulatory status of its surface impoundment. Brooks conducted an environmental audit of the facility and informed T & S in March 1985, that its surface impoundment was a RCRA-regulated unit subject to the November 8, 1985, Loss of Interim Status deadline.

Although T & S was operating a RCRA-regulated unit, the company failed to notify EPA by November 19, 1980, as required by RCRA § 3010, 42 U.S.C. § 6930, that it was treating, storing or disposing of hazardous wastes in its surface impoundment. Additionally, T & S failed to submit "Part A" of an application for a permit to treat, store or dispose of hazardous wastes on site as required by RCRA § 3005, 42 U.S.C. § 6925, and 40 C.F.R. § 270.10.

Although T & S has been in operation since March 1979, the company did not notify DHEC of its hazardous waste treatment, storage, and/or disposal activities until January 20, 1985. T & S also failed to submit Part A of its hazardous waste permit application to DHEC until October 17, 1985. Both of those submissions were required to have been submitted by T & S to EPA by November 19, 1980, under RCRA § 3005(e) and 40 C.F.R. § 270.10. Therefore, T & S never acquired "interim status" under RCRA § 3005.

T & S Brass argues that it relied on the fact that DHEC records classified T & S as a "generator" of hazardous waste rather than a "treatment, storage and disposal facility," and was thus misinformed of its regulatory status. The facts show, however, that the State's classification of T & S was based on defendant's own misrepresentations to DHEC about how its surface impoundment would be used. T & S originally designated the impoundment as an "emergency spillway." T & S never reported to DHEC its routine use of the impoundment for treatment, storage and/or disposal of hazardous waste.

In 1982, DHEC sent reporting forms to all facilities involved in hazardous waste activities in the State, including T & S Brass.[7] The DHEC reporting form set forth the RCRA reporting requirements and defined "facility" for purposes of RCRA. Even though the State had no duty to inform T & S of its status, T & S knew or should have known from the date of its receipt of the DHEC reporting form that its surface impoundment was a treatment, storage and disposal facility subject to the RCRA permitting and financial responsibility requirements.

In January of 1985, T & S contacted DHEC to determine whether its surface impoundment was subject to the insurance requirements of RCRA. This inquiry prompted an internal review by DHEC of its files, which in turn led to correspondence and discussions between DHEC and T & S concerning the regulatory status of T & S' surface impoundment. Based upon its review and subsequent inquiries, DHEC

6. The defendant's Part B application and the closure plan submitted by T & S to EPA both characterize the material in the impoundment as F006 sludge.

7. At trial, the DHEC reporting form was identified as having come from the corporate files of T & S. The United States then entered into evidence a "Certification of Absence of Records," executed by the custodian of DHEC records, certifying that the DHEC files did not contain any record that T & S had submitted the required form. Plaintiff's Exhibit G–57(a).

determined that defendant's surface impoundment was a hazardous waste "land disposal facility" subject to the RCRA § 3005(e) loss of interim status requirements. DHEC then initiated a state enforcement action against T & S for various past RCRA violations.

On October 18, 1985, T & S entered into an Administrative Consent Order with the State that required compliance with RCRA interim status regulations under the state program. The State informed T & S that, pursuant to the Hazardous and Solid Waste Amendments of 1984, T & S was required to certify compliance with financial and groundwater monitoring requirements by November 8, 1985. On November 8, 1985, T & S submitted to EPA Part B of its permit application, and a certification that the company was in compliance with the RCRA groundwater monitoring requirements and *portions* of the RCRA financial responsibility requirements. This certification was a prerequisite to T & S' continued authorized operation of its facility under RCRA § 3005(e)(2). In fact, defendant's certification on its face showed that the T & S was *not* in compliance with RCRA § 3005(e) because it stated that T & S *was unable to obtain insurance* for non-sudden accidental occurrences.

T & S Brass raises two arguments in defense of its noncompliance with the financial responsibility requirements. First, T & S alleges that it was impossible to obtain insurance for non-sudden accidental occurrences because of the uninsurability of its surface impoundment, and therefore, it was impossible for it to comply with the financial responsibility regulations. Second, T & S Brass alleges that it made "good faith" efforts to obtain non-sudden liability insurance.

The Court is aware that obtaining the necessary coverage might have been difficult due to a contraction in the environmental insurance market and T & S Brass' own actions. However, testimony at trial showed that non-sudden liability insurance coverage was in fact available to RCRA-regulated facilities such as T & S Brass in amounts sufficient to meet the RCRA standards. If T & S could not get insurance, it was a consequence of defendant's own past non-compliance with RCRA.

The Court heard testimony at trial from the defendant's insurance broker and from an insurance expert retained by T & S. Both witnesses concluded that as of November 8, 1985, T & S was uninsurable because of the existence of groundwater contamination at the site. The evidence indicates, however, that T & S contributed to the circumstances that made the facility "uninsurable." According to defendant's own witnesses, had T & S provided timely notification of its activities, and had it complied with the groundwater monitoring requirements of RCRA as required by November 19, 1980, T & S' chances of obtaining the non-sudden liability insurance would have been significantly greater.

■ Thus, despite the fact that T & S had difficulty obtaining non-sudden liability insurance, the Court finds that it was not "impossible" for T & S to comply with the law. The statute and regulations require that a TSD facility either comply with the insurance coverage obligations or cease operation of the land disposal unit. T & S' insurance broker, William W. Hollis, Jr., testified that he informed T & S in February, 1985 that the facility would not obtain non-sudden liability insurance coverage. On March 4, 1985, the environmental consulting firm retained by T & S advised the facility that it must comply with the LOIS deadline of November 8, 1985.[8] At that time Mr. Brooks suggested a plan for installation of an above-ground tank system which would not be RCRA-regulated in order to comply with the LOIS deadline. T & S argues that it was unaware of the LOIS deadline until it was informed in August 1985, and therefore had insufficient notice. The Court disagrees. T & S Brass had sufficient time to make arrangements to avoid operating in violation of the law beyond the November 8, 1985, deadline and should have done so.

8. Transcript pp. 1–104, 1–115.

■ T & S Brass asserts as a second defense that it made "good faith" efforts to obtain non-sudden liability insurance. I disagree. Testimony and evidence presented at trial indicate that T & S failed to make a "good faith" effort to obtain the non-sudden liability insurance. T & S did not even file an application for non-sudden liability insurance until *after* the November 8, 1985 cut-off date. (Transcript pp. 2–56, 2–57).

The law gave T & S two options: either certify compliance with the financial responsibility requirements under RCRA or cease using its surface impoundment for the treatment, storage, and/or disposal of hazardous waste.[9] T & S did neither. Thus, T & S failed to meet the November 8, 1985 deadline and thereby lost interim status. Under RCRA § 3005(a) and (e), T & S was required to cease operation of the surface impoundment as a result of loss of interim status. However, T & S continued to use its surface impoundment for the treatment, storage and/or disposal of hazardous waste until May 21, 1986.

## CONCLUSIONS OF LAW

■ 1. *T & S was the owner or operator of a "land disposal facility."*—Section 3005(e) of RCRA clearly applies to land disposal facilities. The EPA interprets the term "land disposal facilities" to encompass the following types of facilities: landfills; land treatment units; *surface impoundments for disposal, treatment, or storage;* waste piles; and Class I hazardous waste underground injection wells."[10]

Although RCRA does not define "land disposal facility," Congress did provide a definition of "land disposal." RCRA § 3004(k) provides that the term " 'land disposal,' when used with respect to a specified hazardous waste in a landfill, shall be deemed to include, but not be limited to, any placement of such hazardous waste in a landfill, *surface impoundment*, waste pile, injection well, land treatment facility, salt dome formation, salt bed formation, or underground mine or cave." 42 U.S.C. § 6924(k) (emphasis added). Thus, EPA's interpretation is consistent with the statute and is reasonable. Moreover, both definitions include the term "surface impoundment." 42 U.S.C. § 6901(b)(7).

T & S argues that its surface impoundment is not a land disposal facility. Defendant's argument is based on a regulatory definition of a "disposal facility," at 40 C.F.R. § 260.10. Under the regulations, a "disposal facility" is "a facility or part of a facility at which hazardous waste is intentionally placed into or on any land or water and at which waste will remain after closure." The definition of "disposal facility" urged by defendant was published in 1980 and by its terms applies only to 40 C.F.R. Parts 260 through 265 of EPA's regulations. This definition is not, and does not purport to interpret what Congress meant by the term "land disposal facility."

Although the Court has determined that the narrow regulatory definition of "disposal facility" is inapplicable to RCRA § 3005(e), even under that definition, the T & S surface impoundment would be *considered* a disposal facility. T & S intentionally and routinely placed electroplating wastewater into its surface impoundment, thereby adding to the accumulation of F006 sludge in that impoundment. Thus, T & S intentionally placed hazardous waste on land. In addition, nickel and chromium, which are constituents either of F006 sludge (a "hazardous waste"), or the electroplating wastewater (a "solid waste"), will remain at the site after closure. 42 U.S.C. § 6903(5) and (27). (Exhibit G–72). Thus, the Court concludes that the T & S Brass surface impoundment was a "land

---

**9.** RCRA § 3005(a) and (e).

**10.** On September 25, 1985, EPA published in the Federal Register a detailed discussion of how the agency would implement and enforce the loss of interim status provision in section 3005(e) of RCRA. 50 Fed.Reg. 38946 (Sept. 15, 1985). That document provided key guidance as to EPA's interpretation of the statutory requirements of section 3005(e). As was noted in a recent Third Circuit decision, the court must give consideration to EPA's interpretation of the statute. *Vineland Chemical Co. Inc. v. EPA,* 810 F.2d 402, 409 (3rd Cir.1987).

disposal facility" subject to the November 8, 1985, LOIS deadline.

2. *T & S had neither a permit nor interim status to operate its hazardous waste land disposal facility.* —It is evident from the record that by August 5, 1985, both T & S and DHEC regarded the surface impoundment as a regulated facility under RCRA. While T & S timely submitted Part B of its permit application to EPA on November 8, 1985, T & S could not certify compliance with the financial responsibility requirements because the company had not obtained the necessary non-sudden liability insurance. 40 C.F.R. § 265.147(b).

Neither of the arguments raised by T & S, namely that it made a good faith effort to obtain the insurance and that the insurance was impossible to obtain, are sufficient defenses. "Good faith" effort is not available as a defense to liability after November 8, 1985, even if T & S could have established it. Prior to November 8, 1985, EPA had allowed regulated facilities which were in compliance with every other aspect of RCRA, but were unable to obtain non-sudden liability insurance to certify compliance with the regulations if the facility had made "good-faith efforts" to obtain insurance. However, this agency-created "good faith" exception to the insurance requirement terminated on November 8, 1985.[11] The language of RCRA § 3005(e) is unambiguous, and Congress chose not to vary it. Thus, after November 8, 1985, a facility's "good faith" efforts to obtain insurance is not a defense to RCRA § 3005(e) liability.

T & S further argues that it was impossible to obtain the insurance, and that this "impossibility" should somehow relieve T & S from having to comply with the November 8, 1985, deadline. The facts, however, show that to the extent that it was impossible for *this* defendant to get insurance, it was due in part to T & S' failure to comply with RCRA for over five years. RCRA-

regulated facilities were required to install groundwater monitoring wells and to prepare quarterly reports on groundwater data. As a consequence of T & S' history of non-compliance, groundwater contamination at the site went undetected and unabated. Eventually, the contamination interfered with the facility's ability to obtain non-sudden liability insurance. However, a facility cannot, by its own actions, make itself uninsurable and then claim "impossibility" as a defense to liability under RCRA § 3005(e).[12]

Further, an "impossibility" defense, if it were to apply at all, relates to a defendant's ability to comply with the law. As noted above, the Court finds as a factual matter that it was not "impossible" for T & S to comply with the LOIS deadline since other alternatives which involved taking the surface impoundment out of use were always available. Compliance with the statutory deadline was mandatory, even if the defendant's only option was to cease its business on November 8, 1985. By imposing an absolute cut-off date for certifying compliance, Congress had already determined that protection of the public health and the environment was paramount.

Thus, T & S failed to certify compliance with the financial responsibility requirements of RCRA, and lost interim status on November 8, 1985. Although T & S submitted Part B of a permit application, it was never issued a permit by EPA or DHEC for the treatment, storage and/or disposal of hazardous waste at its facility.

3. *T & S continued to operate its facility after the November 8, 1985 statutory deadline for loss of interim status.* —The Court finds that T & S was not only aware of the November 8, 1985 cut-off date, but violated the LOIS deadline by knowingly introducing electroplating wastewater into its surface impoundment from November 8, 1985 to May 21, 1986. The evidence at trial indicated that T & S continued to use its

---

11. Transcript pp. 1–14, 1–17.

12. The doctrine of impossibility has well recognized application in the area of contract law. In contract law, the validity of the impossibility of performance may well turn on whether the impossibility of performance was caused by an act or omission of the party claiming the defense. *See generally,* Calamari and Perillo, *The Law of Contracts,* § 198 pp. 316–318, (1970).

on-site surface impoundment for the treatment, storage and/or disposal of hazardous waste until May 21, 1986. T & S stipulated that May 21, 1986, was the last date that electroplating wastewater flowed into the surface impoundment. According to the expert testimony at trial, the addition of wastewater into the impoundment continued to add to the total accumulation of F006 sludge in the bottom. When T & S closed the surface impoundment, some 30,-000 gallons of F006 sludge were removed. Thus, the surface impoundment was used for the storage of hazardous waste in violation of RCRA after the November 8, 1985 deadline.

### Assessment of Civil Penalties under Section 3008(g).

A penalty is appropriate in this case to deprive T & S of the economic benefit of its noncompliance with the November 8, 1985 statutory LOIS deadline. *See Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.,* 791 F.2d 304 (4th Cir.1986) (*affirming* 611 F.Supp. 1542 (E.D.Va.1985)), *rev'd on other grounds,* ― U.S. ―, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), provides: "Any person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation."

■ Assessment of the amount of a civil penalty is committed to the informed discretion of the Court. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 230 n. 6, 95 S.Ct. 926, 930–931 n. 6, 43 L.Ed.2d 148 (1975); *United States v. Phelps Dodge Industries, Inc.,* 589 F.Supp. 1340, 1362 (S.D.N.Y.1984). In exercising this discretion, the Court should give effect to the major purpose of a civil penalty: deterrence. *See United States v. Phelps Dodge Industries, Inc., supra,* 589 F.Supp. at 1358; *United States v. Swingline, Inc.,* 371 F.Supp. 37, 47 (E.D.N.Y.1974); *State, ex rel. Brown v. Dayton Malleable, Inc.,* 1 Ohio St.3d 151, 438 N.E.2d 120, 125 (1982).

Although the statute does not contain any guidance for the Court in determining penalties in a judicial proceeding, RCRA § 3008(a)(3) provides factors that the Administrator shall consider in fixing a civil penalty in an administrative action. RCRA requires the Administrator to take into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In the absence of other statutory guidance, the Court may give consideration to these same factors in determining an appropriate penalty.

■ With those principles in mind, the Court finds as a factual matter that T & S failed to exercise any good faith efforts to comply with the financial responsibility requirements of RCRA and that T & S had knowledge of the November 8, 1985, statutory deadline. However, the Court will also take into consideration the fact that T & S has already paid a penalty of $19,500 to South Carolina for violations of RCRA. In addition, T & S has now installed an above-ground tank system, at considerable expense, as part of its wastewater treatment process and, by all indications, is proceeding to close its surface impoundment in a manner consistent with EPA and South Carolina regulations. Thus the Court determines that, based on the specific circumstances of this case, a penalty of $1,000 per day is appropriate. The Court finds that the surface impoundment remained an active and integral part of the wastewater treatment operation through May 21, 1986, 194 days after the LOIS deadline. Thus, the defendant, T & S is hereby ordered to pay $194,000.00 in civil penalties.

The Court also grants plaintiff's prayer for injunctive relief, directing T & S to comply with all RCRA closure and post-closure requirements, pursuant to EPA's regulations at 40 C.F.R. Part 264. The imposition of a permanent injunction directing T & S to close its facility in accordance with a plan approved by DHEC and EPA will not only insure that the applicable regulations will be followed but also that the environment will be adequately protected during

and following defendant's closure of the surface impoundment at issue.

IT IS SO ORDERED.