UNITED STATES of America,
Plaintiff–Appellee,

v.

BETHLEHEM STEEL CORPORATION,
Defendant–Appellant.

No. 93–2260.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 26, 1993.

Decided Sept. 26, 1994.

Order Jan. 30, 1995.

David Capp, U.S. Atty., Andrew B. Baker, Jr., Asst. U.S. Atty., Office of U.S. Atty., Dyer, IN, Deborah A. Kline, E.P.A., J. Carol Williams (argued), Martin W. Matzen, Richard B. Stewart, Dept. of Justice, Land & Natural Resources Div., Washington, DC, Richard Clarizio, Dorothy Attermeyer, Catherine J. Garypie, Thomas M. Giller, E.P.A., Region 5, Office of the Regional Counsel, Chicago, IL, John H. Grady, Kevin P. Holewinski, Dept. of Justice, Environmental Enforcement Section, Washington, DC, for plaintiff-appellee.

Bryan G. Tabler (argued), Mark E. Shere, Donald E. Williams, Barnes & Thornburg, Indianapolis, IN, William H. Graham, Bethlehem Steel Corp., Law Dept., Bethlehem, PA, for defendant-appellant.

David A. Brown, Philip C. Schillawski, J. Van Carson, Squire, Sanders & Dempsey, Cleveland, OH, Barton C. Green, American Iron and Steel Institute, Washington, DC, for amicus curiae.

Before ESCHBACH, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

The United States brought this penal enforcement action on behalf of the United States Environmental Protection Agency ("EPA") against Bethlehem Steel Corporation to enforce hazardous waste requirements under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k, and the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f–300j–26.

Bethlehem Steel Corporation owns and operates an integrated steelmaking facility at Burns Harbor, Indiana. The United States alleges that a series of environmental violations have occurred (and continue to occur) at Burns Harbor. More specifically, the government's complaint asserts six claims for injunctive relief and civil penalties in connection with two types of "solid" waste[1] generated by the facility. The government's first

---

1. Under RCRA, the term "solid waste" expressly includes sludges and liquid wastes. 42 U.S.C. § 6903(27).

claim concerns the plant's generation of waste ammonia liquor. Bethlehem disposes of waste ammonia liquor by channelling it through pipes, then forcing it down under pressure into two Class I underground injection wells at the plant site. The government's second through sixth claims pertain to sludges the plant previously generated from the treatment of electroplating and other wastewaters. These sludges are currently stored or disposed of in two finishing lagoons and a landfill, also at the plant site.

Both parties moved for partial summary judgment on the six claims. The district court granted partial summary judgment in favor of the United States on all the claims and denied Bethlehem's motions. In its Memorandum Opinion and Order, the district court issued a permanent injunction, ordering Bethlehem to comply with its hazardous waste obligations under the two statutes.[2] Bethlehem appeals from the district court's decision.

## I. BACKGROUND

RCRA establishes a comprehensive federal "cradle-to-grave" program regulating the generation, transportation, storage, treatment, and disposal of hazardous waste. Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), generally prohibits the operation of hazardous waste management facilities or units, except in accordance with a RCRA permit or with established interim status requirements. All of Bethlehem's problems in this case arise either from the company's alleged failure to follow the conditions of a valid permit or to comply with interim status regulations.

A. United States' First Claim for Relief

Bethlehem's ammonia waste liquor is a characteristic "hazardous waste" within the meaning of 42 U.S.C. § 6903(5). Therefore, pursuant to 42 U.S.C. § 6925(a), Bethlehem must heed RCRA's permit requirements for hazardous waste management before it may legally dispose of the ammonia in its underground injection wells. In certain instances, RCRA allows an owner or operator of a hazardous waste facility to satisfy RCRA permit obligations through compliance with provisions promulgated under environmental statutes other than RCRA. In this case, the operator of an underground injection well into which hazardous wastes are injected satisfies its RCRA hazardous waste permit obligations by obtaining and complying with an Underground Injection Control ("UIC") permit, which it is in turn required to have under the SDWA.[3] 40 C.F.R. § 270.60.

In 1976, Congress enacted the SDWA to protect the nation's drinking water sources. Section 1421 of the SDWA, 42 U.S.C. § 300h, and its implementing regulations establish the minimum requirements for state UIC programs governing underground injection wells. In Indiana, the applicable UIC program for Class I injection wells is administered by the EPA and consists of federal UIC regulations.[4]

On September 30, 1985, the EPA issued Bethlehem two UIC permits under the SDWA, authorizing it to dispose of its ammonia liquor in the facility's underground injection wells. The permits, however, were conditioned upon Bethlehem's performance of a three-phase corrective action program for all of the solid waste management units on its property. Phase I (Preliminary Assessment) required Bethlehem to submit an initial assessment report no later than 45 days after the effective date of the permit. Phase II (Corrective Action Plan) required Bethlehem to submit, within six months of the effective date of the permit, a corrective action plan to ameliorate any hazardous releases. Phase III (Corrective Action Implementation)

---

2. At the time this appeal was taken, the district court had not entered a final judgment in this case, pending a hearing to assess civil penalties against Bethlehem. Under 28 U.S.C. § 1292(a)(1), we have jurisdiction over appeals from interlocutory orders of the district court granting or modifying injunctions. The district court has since resolved the penalties issue and rendered a final judgment in this case. Bethle-

hem's separate appeal of the civil penalty is currently pending in this court.

3. Therefore, by violating the conditions of a single UIC permit, an operator or owner may run afoul of both the SDWA and RCRA.

4. These regulations are at 40 C.F.R. Pts. 124, 144–46, § 147.751.

obliged Bethlehem to implement its corrective action plan within 36 months of the effective date of the permit. The United States alleges that Bethlehem violated the permit requirements of both RCRA and SDWA by failing to perform any phase of the corrective action program according to the schedule prescribed by the UIC permits.

### B. United States' Second through Sixth Claims for Relief

In its second through sixth claims for relief, the United States alleges that Bethlehem violated RCRA by failing to comply with RCRA "interim status performance standards" for its landfill and two terminal polishing lagoons.

From the mid–1960's until June 16, 1983, Bethlehem conducted tin and chromium electroplating at its Burns Harbor facility, generating electroplating wastewater as a by-product. Bethlehem treated this electroplating wastewater by, among other things, mixing it with other kinds of wastewaters, then adding a flocculent or thickener and allowing the resulting solids to settle to the bottom as sludge. After the clarified water was drawn off, the sludge was filtered. The clarified water was sent to two terminal polishing lagoons to allow further settling and to allow the temperature and chemical composition of the water to equilibrate. The filtered sludge was disposed of in the landfill. The United States contends that because 40 C.F.R. § 261.31 lists "wastewater treatment sludges from electroplating operations" as F006 hazardous waste, Bethlehem's landfill and lagoons are "hazardous waste management units" subject to 42 U.S.C. § 6925(a)'s permit requirements.

In enacting RCRA, Congress recognized that the EPA could not issue permits to all applicants before RCRA's effective date. Thus, RCRA provides that facilities already in existence on November 19, 1980, could continue to manage hazardous waste without a permit on an "interim status" basis, until the EPA made a final administrative disposi-

tion of their submitted permit applications. 42 U.S.C. § 6925(e). To obtain interim status, existing facilities were required to submit a "Part A application" by a certain date and then were to be "treated as having been issued [a] permit." 42 U.S.C. § 6925(e).

Such facilities nonetheless were required to conduct their hazardous waste management in compliance with the "interim status standards" set forth at 40 C.F.R. Pt. 265. In the last five counts of its complaint, the government alleges that Bethlehem did not meet its interim status obligations to (1) comply with closure and post-closure requirements, (2) implement a groundwater monitoring system, (3) establish financial assurance for closure and post-closure care of each of its units, (4) implement a run-on control system for the landfill, and (5) submit a Part B application as requested by the Indiana Department of Environmental Management.[5]

The district court agreed with the government and granted partial summary judgment on all six of the United States' claims, holding Bethlehem liable for injunctive relief and civil penalties not to exceed $25,000 per day of violation for each of Bethlehem's violations. The court's memorandum opinion contained an injunction ordering Bethlehem to comply with the corrective action requirements of its UIC permit, and with the interim status requirements for its terminal polishing lagoons and landfill.[6]

## II. DISCUSSION

We review grants of summary judgment *de novo* to determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 716 (7th Cir.1994). On appeal, Bethlehem raises numerous defenses to liability, and we examine their arguments with regard to the UIC permits and to the landfill and polishing lagoons in order.

5. This last requirement is found at 40 C.F.R. § 270.10, but is a requirement imposed upon interim status facilities.

6. The court determined the amount of Bethlehem's civil penalties at a separate hearing held at a later date, *see supra* note 1.

## A. Underground Injection Control Permits

Bethlehem contends that it is not liable for violating RCRA and SDWA by continuing to operate its underground injection wells without abiding by the corrective action conditions of the wells' UIC permits. First, it maintains that the government's first claim against it is moot, because the EPA has itself already completed Phase I of the corrective action program for Bethlehem by preparing a "RCRA Facility Assessment" ("RFA") report on the Burns Harbor facility.[7] Second, Bethlehem submits that it was unreasonable for the EPA to expect it to complete the corrective action program according to schedule because the corrective action deadlines were impossible to meet and were imposed "in a boilerplate fashion" contrary to EPA's own policies. The district court held that neither the unreasonableness of the EPA's deadlines nor the impossibility of compliance with them is a defense to an enforcement action. We agree that Bethlehem is not excused from complying with its permit obligations.

■ First, Bethlehem's argument that the United States' claim has been rendered moot because of the EPA's RFA report is wholly meritless. As the government points out in its brief, even if the EPA's RFA had contained the precise information that Bethlehem was required to submit under Phase I of its corrective action program, the preparation of the RFA by the EPA would not have relieved *Bethlehem's* obligation to perform its own preliminary assessment report. Bethlehem's mootness argument is further belied by the fact that in July 1990, it did begin to submit its own preliminary assessment report, regardless of the existence of the RFA. Therefore, we conclude that Bethlehem was required to submit a preliminary assessment report regardless of the EPA's RFA report.[8]

Bethlehem's assertion of an impossibility defense is likewise unavailing. The district court concluded that the " 'impossibility defense' is no defense to this type of action brought under RCRA." Ample case law exists to support the district court's conclusion. In *United States v. Production Plated Plastics, Inc.*, 742 F.Supp. 956 (D.Mich.1990), *op. adopted by* 955 F.2d 45 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992), the court held that neither impossibility nor good faith efforts to secure financial assurances are defenses to liability for failure to do so under RCRA.[9] *Id.* at 961–62 (citing *United States v. Clow Water Sys.*, 701 F.Supp. 1345, 1348 (S.D.Ohio 1988); *United States v. Allegan Metal Finishing Co.*, 696 F.Supp. 275, 285 (W.D.Mich.1988); *United States v. T & S Brass and Bronze Works, Inc.*, 681 F.Supp. 314 (D.S.C.), *aff'd in part and vacated in part on other grounds,* 865 F.2d 1261 (4th Cir.1988)).

■ We need not decide here whether an impossibility defense may be successfully asserted in RCRA actions, for in this case, we agree with the district court that it was not impossible for Bethlehem to meet the corrective action deadlines. The court found that Bethlehem could have "complained earlier about the restrictive time schedule, and the EPA and the Defendant could have modified the time schedule to assure compliance by the Defendant." By definition, where there is a possible alternative, there is no impossibility. *See T & S Brass,* 681 F.Supp. at 321 (stating that because an operator could always stop operating a surface impoundment or else cease its business, it was not impossible to comply with a RCRA deadline).

Although Bethlehem lodged objections on several occasions to the corrective action conditions, never did it challenge the allotted time for compliance or ask for an extension.

---

7. The EPA prepared this RFA because it anticipated that Bethlehem would need a separate RCRA permit to operate other hazardous waste management units at the facility. The EPA uses these RFA's to help formulate site-specific corrective action measures for a particular applicant before it issues a RCRA permit.

8. We additionally observe that even if the RFA report did relieve Bethlehem of its duty to submit

a Phase I report, the government's first claim would be far from moot, because it alleges that Bethlehem also failed to complete Phases II and III of the corrective action program.

9. The court held, however, that good faith efforts to comply with RCRA's financial responsibility requirements are "pertinent to the appropriate remedies or imposition of sanctions."

In a letter dated October 2, 1985, Bethlehem informed the EPA that it "intend[ed] to comply with the 'Preliminary Assessment' requirements in Attachment F of the UIC permit in accordance with the specified schedule." On November 15, 1985, Bethlehem filed an administrative appeal with the EPA challenging the validity of the UIC permits, but not the time frame for compliance embodied in them.[10]

The EPA denied Bethlehem's administrative appeal on January 19, 1989, and the permits became effective as a final agency action on that date. Bethlehem then appealed the EPA's decision to this court, asking for a stay of the applicability of the permits pending our decision. We refused. We subsequently upheld the validity of the UIC permits in *Inland Steel Co. v. EPA*, 901 F.2d 1419 (7th Cir.1990). The EPA notified Bethlehem and the State of Indiana of the UIC permit violations on April 19, 1990. Three more months passed from the date of the EPA's notice before Bethlehem initiated steps to submit the Phase I preliminary assessment.

Like the district court, we are troubled by Bethlehem's extended history of inaction. Bethlehem did not attempt compliance until long after the corrective action deadlines had passed. In any event, Bethlehem has known since 1985 that it likely had to submit a preliminary assessment according to schedule, and was under a continuing obligation to do so ever since January 19, 1989. Bethlehem cannot first agree to the EPA's corrective action deadlines, refrain from asking for a modification, wait until the deadlines have long passed before even attempting compliance, then assert in an enforcement action that it was excused from compliance because the time frames were unreasonable or impossible. As the court stated in *T & S Brass and Bronze*, "a facility cannot, by its own actions, make itself [unable to meet RCRA's requirements] and then claim 'impossibility' as a defense to liability under RCRA § 3005(e)." 681 F.Supp. at 321. The district court correctly rejected Bethlehem's defenses in connection with the UIC permits and properly granted partial summary judgment in favor of the United States on its first claim.

■ Lastly, Bethlehem argues generally that the district court erred by issuing a permanent injunction against it without conducting a balancing of equities or considering whether irreparable harm would result if the injunction were not granted.[11]

Ordinarily, a court is obligated to conduct an equitable balancing of harms before awarding injunctive relief, even under an environmental statute which specifically authorizes such relief (as does RCRA section 3008(a)). The Supreme Court has explained that so long as the statute does not evidence a congressional intent to deny courts their traditional equitable discretion, courts must undertake such a balancing analysis. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). We believe, however, that with regard to the UIC permits in this case, the district court properly ordered injunctive relief against Bethlehem without undertaking a weighing of the equities or making a finding of irreparable harm.

First, in *EPA v. Environmental Waste Control*, 917 F.2d 327 (7th Cir.1990), *cert. denied*, 499 U.S. 975, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991), we upheld a permanent injunction against the operation of an interim

10. Bethlehem could have requested a modification of the time schedule in the UIC permits. The permit itself states that the "Director may, for cause or upon request from the permittee, *modify*, revoke and reissue, or terminate this permit" (emphasis added) pursuant to 40 C.F.R. §§ 144.12, 144.39, and 144.40. *Cf. W.R. Grace & Co. v. EPA*, 959 F.2d 360, 361 n. 1, 366 & n. 13 (1st Cir.1992) (stating that "if additional time becomes necessary for the completion of an investigative phase task [under a RCRA permit], [a facility] 'can request a modification of the sched-

ule of compliance ... [pursuant to] 40 C.F.R. § 270.42,'" and that a denial of such modification is reviewable).

11. We address the propriety of injunctive relief here in connection with the government's first claim only. Given our decision on the government's second through sixth claims, we need not and do not reach the issue of whether injunctive relief was the appropriate form of remedy with regard to any other claim in this suit.

status landfill in an enforcement action under RCRA. We noted in that case that "[i]t is an accepted equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful." *Id.* at 332 (citing *Guam Scottish Rite Bodies v. Flores*, 486 F.2d 748, 749 (9th Cir.1973)). In its order denying Bethlehem's Motion to Rescind the Court's Injunction and/or Stay the Injunction Pending Appeal and Administrative Hearings, the district court, in this case, stated that there was "no doubt that [it had] found that the Defendant's conduct has been willful."

Furthermore, we also observed in *Environmental Waste Control* that

the law of injunctions differs with respect to governmental plaintiffs (or private attorneys general) as opposed to private individuals. Where the plaintiff is a sovereign and where the activity may endanger the public health, "injunctive relief is proper, without resort to balancing." *Illinois v. [City of] Milwaukee*, 599 F.2d 151, 166 (7th Cir.1979), *rev'd on other grounds*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). Second, in cases of public health legislation, the emphasis shifts from irreparable injury to concern for the general public interest....

*Id.* (quoting *Environmental Def. Fund, Inc. v. Lamphier*, 714 F.2d 331, 337–38 (4th Cir. 1983)). Here, not only is the plaintiff the United States, but the activity in question is the underground disposal of a characteristic hazardous waste. RCRA section 1002(b)(2) declares that "disposal of ... hazardous waste in or on the land without careful planning and management can present a danger to human health and the environment."

For these reasons, we conclude that with regard to the part of the injunction pertaining to Bethlehem's UIC permits, there was a lesser need for a balancing analysis. Thus, it was not improper for the district court to have awarded injunctive relief against Bethlehem without conducting an equitable balancing.

### B. Landfill and Polishing Lagoons

■ Bethlehem next argues that the district court erred in granting partial summary judgment in favor of the government on its second through sixth claims. It advances a plethora of arguments as to why it is not liable for failing to comply with RCRA's interim status performance standards for its two terminal polishing lagoons and its landfill. We, however, need only address one of Bethlehem's arguments to reach our decision regarding the government's interim status claims.

As we previously discussed, RCRA section 3005's permit requirements apply to the treatment, storage, and disposal of hazardous wastes. Wastes are considered hazardous, and therefore subject to RCRA's subtitle C permit requirements, if they fit one of two categories. First, they may be "characteristic" hazardous wastes, meaning they possess one of the four hazardous characteristics of ignitability, corrosivity, reactivity, or toxicity. 40 C.F.R. § 261, subpart C. Second, the EPA may deem wastes hazardous by rulemaking. These wastes are known as "listed wastes." *See id.* § 261, subpart D. Listed wastes remain hazardous waste until the EPA approves a petition for its "delisting." *See* 40 C.F.R. §§ 260.20, 260.22; *Chemical Waste Management, Inc. v. EPA*, 976 F.2d 2, 8 (D.C.Cir.1992), *cert. denied sub nom. Chemical Mfrs. Ass'n v. EPA*, —— U.S. ——, 113 S.Ct. 1961, 123 L.Ed.2d 664 (1993).

The United States maintains that the settled sludge at the bottom of Bethlehem's finishing lagoons and the filtered sludge disposed of in its landfill are F006 listed waste, because the sludges are properly classified as "wastewater treatment sludges from electroplating operations." *See* 40 C.F.R. § 261.31. The government advances two bases under which Bethlehem's sludges should be considered regulated F006 waste.

First, it argues that the language of the F006 listing itself—"wastewater treatment sludges from electroplating operations"—contemplates "mixed" sludges like Bethlehem's (i.e., those resulting from the treatment of wastewaters which came in part from electroplating operations). Second, it argues that even if the language of the F006 listing does not cover "mixed" electroplating sludges, the regulation should still be read

consistently with the " 'general principle [underlying RCRA] that a hazardous waste does not lose its hazardous character simply because it changes form or is combined with other substances.' " To fail to do so, the government warns, would effectively gut RCRA.

If Bethlehem's sludges are listed waste, they would be considered hazardous until delisted. Bethlehem's sludges were not delisted; therefore, Bethlehem's lagoons and landfill would be subject to RCRA's section 3005 interim status requirements, if indeed they contain F006. (Recall that Bethlehem was a pre-November 19, 1980 facility with a permit application pending with the EPA and was thus qualified to be an interim status facility). Bethlehem has failed to meet a slew of the EPA's interim status standards, 40 C.F.R. § 265; thus, if the government's arguments are correct, Bethlehem would potentially be liable for injunctive relief and penalties.

Bethlehem attempts to refute the government's arguments by (1) asserting that the F006 listing, by its terms, applies only to sludge from pure electroplating wastewaters; and (2) referring us to *Shell Oil v. EPA,* 950 F.2d 741 (D.C.Cir.1991), to support the proposition that its wastewater treatment sludge is not F006 listed waste because it has been mixed with other solid wastes.

We agree with Bethlehem on both points. We must first acknowledge that the plain language of the F006 listing is not particularly instructive in this case. Although the district court notes that "the term 'wastewater treatment sludges from electroplating operations' does not have the words 'solely', 'only', or 'exclusively' in it, to imply that only wastewater treatment sludges from electroplating operations and not a mixture thereof is hazardous waste," we are equally persuaded by Bethlehem's observation that the listing also "does not contain the words, 'partly,' 'mixed with,' or 'in trace amount' either."

Similarly, we find it significant that the F006 listing lacks the phrase "mixtures/blends," or any mention of a threshold concentration percentage (for instance, ten percent or more electroplating wastewater). The F001–F005 listings immediately preceding F006 contain both.[12] A facility may reasonably infer that when the EPA intends to include waste mixtures in its listings, it knows how to do so, and that in the F006 listing, such mixture language is conspicuously absent. Subsequently, the EPA explicitly "amend[ed] ... [the F001–F005] spent solvent listings to include solvent mixtures," 40 C.F.R. § 271.1 (table 1); 50 Fed.Reg. 53318 (December 31, 1985) ("Today's amendment will close a major regulatory loophole which allows toxic solvent mixtures to remain unregulated."), but did not amend the F006 listing to include electroplating wastewater mixtures.

Finally, the EPA's statement at 45 Fed. Reg. 33095 (May 19, 1980), with regard to its promulgation of the "mixture rule," provides the last clue that tips our construction of the F006 listing in Bethlehem's favor. The EPA there stated:

*1. What is hazardous waste?*
Paragraph (a) of this section defines what a hazardous waste is. It provides that a solid waste is a hazardous waste if ... it either (1) is listed as a hazardous waste in Subpart D, (2) is a waste mixture containing one or more hazardous wastes listed in Subpart D....

*   *   *   *   *   *

*Although it was not expressly stated* in the proposed regulation, EPA intended waste mixtures containing listed hazardous wastes to be considered a hazardous waste and managed accordingly. *Without [the mixture] rule, generators could evade Subtitle C requirements simply by commingling listed wastes with nonhazardous solid waste....* Obviously, this would leave a major loophole in the Subtitle C management system and create inconsistencies in

---

**12.** For example, the F004 listing specifies "the following spent non-halogenated solvents: Cresols and cresylic acid, and nitrobenzene; all spent solvent mixtures/blends containing, before use, a total of ten percent or more (by volume) of one or more of the above non-halogenated solvents or those solvents listed in F001, F002, and F005; and still bottoms from the recovery of these spent solvents and spent solvent mixtures."

how wastes must be managed under that system.

45 Fed.Reg. 33095 (May 19, 1980) (emphasis added). Thus, the EPA itself seems to concede that although it meant to include waste mixtures in the Subpart D listings, without a separate rule specifying that such mixtures are hazardous, the language of the listing itself fails to reach such mixtures. We conclude that the F006 listing does not, independent of the mixture rule, include Bethlehem's mixed wastewater treatment sludges.

Bethlehem is also correct that its sludges are not listed F006 waste because the *Shell Oil* case invalidated the mixture rule. We must preface our discussion here with a word of background.

When the EPA published its proposed regulation regarding the definition of hazardous waste, it did not include the mixture rule in the definition. Nevertheless, when the EPA published its final regulations, it promulgated the mixture rule at 40 C.F.R. § 261.3(a)(2)(ii) as part of the final rule. In pertinent part, the final rule provided:

§ 261.3 Definition of hazardous waste.

(a) A solid waste, as defined in § 261.2, is a hazardous waste if:

\*　　\*　　\*　.　\*　　\*　　\*

(2) It meets any of the following criteria:

(i) It is listed in Subpart D and has not been excluded from the lists in Subpart D under 260.20 and 260.22 of this Chapter.

*(ii) It is a mixture of solid waste and one or more hazardous wastes listed in Subpart D and has not been excluded from this paragraph under §§ 260.20 and 260.22 of this Chapter.*

(mixture rule emphasized).

In *Shell Oil,* the District of Columbia Circuit held that because the rule did not appear in the proposed regulations, the EPA had failed to give sufficient notice and opportunity for comment in promulgating the mixture rule. The court vacated and remanded the rule to the EPA, suggesting that "in light of the dangers that may be posed by a discontinuity in the regulation of hazardous wastes,

... the agency may wish to consider reenacting the rule[ ], in whole or part, on an interim basis under the 'good cause' exemption to 5 U.S.C. § 553(b)(3)(B) pending full notice and opportunity for comment." *Id.* at 752 (citation omitted).

As we have noted, by later promulgating a separate mixture rule at subsection (a)(2)(ii), the EPA appears to have anticipated that the simple listing of a waste would subject to regulation only those facilities that managed the waste in pure form. In *Shell Oil,* the court described the regulatory history of the rule, noting that

the EPA acknowledged at the outset that the mixture rule was "a new provision," and that it had no "direct counterpart in the proposed regulations." 45 Fed.Reg. 33,095. Nevertheless, it added the rule "for purposes of clarification and in response to questions raised during the comment period concerning waste mixtures and when [they] cease to be subject to the Subtitle C ... management system." *Id.* ... [T]he EPA stated that it had "intended" to treat waste mixtures containing Subpart D wastes as hazardous. It then presented the mixture rule as necessary to close "a major loophole in the Subtitle C management system." *Id.* 33,095. Otherwise generators of hazardous waste "could evade [those] requirements simply by commingling [Subpart D] wastes with nonhazardous solid waste" to create a [non-listed] waste that ... posed a hazard....

*Shell Oil,* 950 F.2d at 749. The court held, however, that regardless of the EPA's unexpressed intentions, the mixture rule was not a "logical outgrowth" of the EPA's proposed regulations, and that it therefore could not find that interested parties had received "implicit notice" of the mixture rule from the proposed regulations. *Id.* at 751–52. The court further observed that a "shift in strategy" between the EPA's proposed regulations and the final rule "erod[ed] the foundation of the EPA's argument that the mixture rule was implicit in the proposed regulations." It stated:

A system that would rely primarily on lists of wastes and waste-producing processes might imply inclusion of a waste until it is formally removed from the list. *The proposed regulations, however, did not suggest such a system.* Rather, their empha-

sis on characteristics suggested that if a waste did not exhibit the nine characteristics originally proposed, it need not be regulated as hazardous. We conclude, therefore, that the mixture rule was neither implicit in nor a "logical outgrowth" of the proposed regulations.

*Id.* at 752 (emphasis added).

In its brief, the United States argues to this court the very theory explicitly rejected by *Shell Oil.* The government states, "The regulation of these [mixed wastes] is not a result of the application of specific rules such as the 'mixture rule,' but a result of application of the more general principles and provisions embodied in these rules." And further, "The RCRA 'continuing jurisdiction' principle means only that the hazardous waste portion of the mixture is subject to regulation—i.e., that one cannot hide waste or change its hazardous character by mixing it into a pile of non-hazardous waste." The government, in essence, urges us to reach a conclusion directly at odds with the reasoning in *Shell Oil;* namely, that the EPA may reach mixed wastes without relying on the mixture rule, because the principles underlying the rule are implicit in the Subpart D listings and the final rule, stripped of the invalidated mixture provision.

This we decline to do. We find the reasoning of the *Shell Oil* opinion persuasive on the point that the regulation of waste mixtures is simply not a logical outgrowth of the proposed definition of hazardous waste, and that without the explicit mixture rule, the definition leaves a major loophole through which waste mixtures could slip. Therefore, we must reject the notion that the policy behind the mixture rule is "embodied" as a general principle within the definition and that such a principle may operate to reach wastes that would have been covered by the mixture rule, but for its invalidation.

Finally, we determine that no "principle of continuing jurisdiction" is applicable to this case. The principle of continuing jurisdiction applies not to mixtures of hazardous and nonhazardous solid wastes, but to mixtures of hazardous waste and environmental media, such as soil and groundwater. *See Chemical*

*Waste Management, Inc. v. EPA,* 869 F.2d 1526 (D.C.Cir.1989). In *Chemical Waste Management,* the court adopted the agency's position regarding environmental media contaminated by hazardous waste. The agency's position was "that hazardous waste cannot be presumed to change character when it is combined with an environmental medium, and that the hazardous waste restrictions therefore continue to apply to waste which is contained in soil or groundwater." *Id.* at 1539. The court went on to state, however, that "[t]he EPA's approach to contaminated soil is also ... entirely consistent with the agency's general regulatory framework, which emphasizes that a continuing presumption of hazardousness attaches to hazardous waste which changes form or is combined with other substances." *Id.* at 1540–41.

Ironically, the court deduced that such a "coherent regulatory framework" existed, partly because of the now-invalid mixture and "derived-from" rules.[13] *Id.* at 1539–40. It noted that "[p]recisely the same logic" that underlies the mixture and derived-from rules applies to the conclusion that the EPA has continuing jurisdiction over combinations of hazardous waste and environmental media.

Because the mixture and derived-from rules were invalidated in *Shell Oil,* the government's attempt to use the principle of continuing jurisdiction here to buttress its claim regarding Bethlehem's mixed wastes constitutes bootstrapping. We conclude that Bethlehem's wastewater treatment sludges cannot be F006 listed waste by virtue of the principle of continuing jurisdiction.

## CONCLUSION

Bethlehem violated RCRA and SDWA by failing to comply with the corrective action conditions required by the two UIC permits for its underground injection wells. Therefore, we AFFIRM the district court's grant of partial summary judgment and injunctive relief against Bethlehem on the United States' first claim.

13. Notably, the *Chemical Waste Management* court explained that the petitioners in that case did not challenge the mixture or derived-from rules and that it "therefore presume[d] the validity of these rules in the current proceeding, although it recognize[d] that the regulations were the subject of a timely challenge which [wa]s presently pending before th[e] court." That challenge, of course, was *Shell Oil v. EPA.*

On the other hand, Bethlehem's wastewater treatment sludges do not fall within the listing for F006 hazardous waste. The parties agree that the sludges are a mixture of F006 and non-hazardous waste, and the government does not allege that Bethlehem's sludges are hazardous waste by virtue of any theory other than its listing as F006 waste. As such, the sludges in Bethlehem's two lagoons and landfill are not subject to RCRA subtitle C requirements as a listed hazardous waste. We therefore VACATE the portion of the district court's opinion that grants partial summary judgment and injunctive relief against Bethlehem on the United States' second through sixth claims, and REMAND the case with instructions to enter partial summary judgment in favor of Bethlehem with regard to those five claims.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

This is a difficult case and my colleague has crafted a careful and thoughtful opinion. I am pleased to join all but one aspect of it.

I believe that the sludge at the bottom of Bethlehem's finishing lagoons and the filtered sludge in its landfill are properly classified as F006 listed waste because these sludges are "wastewater treatment sludges from electroplating operations." 40 C.F.R. § 261.31. In my view, the agency's description is very clear and further specificity is not required. I note that the F006 listing specifically eliminates from its scope sludges produced by certain processes. If the agency believed that other exclusions, based for instance on the percentage of the sludge attributable to hazardous waste, were appropriate, it would have included such a specification.

### ORDER

#### Jan. 30, 1995

In our opinion dated September 26, 1994, we vacated the District Court's liability finding on counts two through six of the complaint and remanded to the District Court with instructions to enter partial summary judgment in favor of Bethlehem Steel Corporation on those counts. **IT IS NOW OR-DERED** that the instruction to the District Court shall include vacation of that portion of its August 31, 1993, memorandum order, im-

posing civil penalties for violations alleged in counts two through six.